**SUN OIL COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION,**
Respondent.

Nos. 16020, 16021, 16213, 16321,
16410, 16548.

United States Court of Appeals
Fifth Circuit.

May 9, 1958.

Rehearing Denied June 11, 1958.

**234**

Joiner Cartwright, Herf M. Weinert, Beaumont, Tex., Martin A. Row, J. W. Timmins and Leo J. Hoffman, Dallas, Tex., Robert E. May, May, Shannon & Morley, Omar L. Crook, Charles M. Soller, Washington, D. C., for petitioner.

Willard W. Gatchell, Gen. Counsel, Howard E. Wahrenbrock, Sol., William W. Ross, Atty., Federal Power Commission, Washington, D. C., for respondent.

Before TUTTLE, JONES and WISDOM, Circuit Judges.

JONES, Circuit Judge.

These six cases arise from similar fact situations and present substantially the same issues of law. They were argued together and one opinion will dispose of all of the cases. The problems presented are among those following the decision in Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, 3 P.U.R.3d 129. There it was held that sales made in interstate commerce of natural gas of independent producers are subject to regulation by the Federal Power Commission under the Natural Gas Act. 52 Stat. 821, 15 U.S.C.A. § 717 et seq. The methods followed and the steps taken by the Commission in fashioning procedures for this extension of its regulatory activities are outlined in Magnolia Petroleum Co. v. Federal Power Commission, 5 Cir., 1956, 236 F.2d 785, 15 P.U.R.3d 364, certiorari denied 352 U.S. 968, 77 S.Ct. 356, 1 L.Ed.2d 322.

By the Natural Gas Act it is provided that, under such rules and regulations as the Commission may prescribe, every natural-gas company shall file schedules showing its rates and charges with related data and all contracts affecting or relating to the rates, charges, classifications and services, 15 U.S.C.A. § 717c (c). Every natural-gas company subject to regulation is required to procure from the Commission a certificate of public convenience and necessity before doing business. Those engaged in transportation or sale of natural gas on February 7, 1942, the effective date of an amendment to the Act, were entitled to certificates, upon application, as to the routes of transportation or within the area of sales existing on that date. 52 Stat. 825, as amended by 56 Stat. 83, 15 U.S.C.A. § 717f(c). The rules and regulations of the Commission for the administration of the Act were designed primarily to cover pipe line transportation of natural gas. They were neither designed for nor adapted to the regulation of independent producers. To provide procedures applicable in the field of regulating independent producers the Commission issued its so-called No. 174 series of orders. See Magnolia Petroleum Co. v. Federal Power Commission, supra.

Involved in Case No. 16020 is the pooled gas unit of 659.44 acres in the Carthage Field, Panola County, Texas, and known as Carthage Unit No. 16. Sun Oil Company, the petitioner, hereafter referred to as Sun, owned a 12.-89% interest. Stanolind Oil and Gas

Company owed a 42.72% interest and two other oil companies owned the remaining interests. On October 5, 1946, these four companies executed an operating agreement under which Stanolind was designated as the operator and as such was given charge of the drilling, development and producing operations for the production of gas in the unit area. Each party was given the right to take its share of production in kind. If any party did not exercise the right to take its share of the gas in kind, or of separately disposing of such gas, the operator was given "charge and control of the marketing of such production."[1] Stanolind and other oil and gas companies made an amended contract on July 1, 1952, for the sale to Texas Gas Transmission Corporation of gas from eleven units in the Carthage Field, including Carthage Unit No. 16. Sun was not a party to this sales contract and did not sign it. Sun was not referred to in the body of the contract but was designated as the owner of its 12.89% of Unit 16 in an exhibit referred to in and forming a part of the contract.

In Case No. 16021 Sun was the owner of a 40.068% interest in the Sun-Sallie J. Neal "A" Unit of 467.93 acres in Panola County, Texas. Sun is designated as the operator under the operating agreement. Sun authorized The Chicago Corporation to sell the gas from the well on the Unit to Tennessee Gas Transmission Company under a contract to which Sun is not a party and which Sun did not sign.

Case No. 16213 involves the Richardson Unit in Panola County, Texas. It includes 662.52 acres. Sun owns 17.7142% of the Unit. The operating agreement designated R. Lacy, Inc. as the operator and provided that the sales of gas should be made to Lone Star Gas Company under a prior contract to which reference was made. Sun was not a party to nor a signer of the contract with Lone Star Gas Company.

In case 16410 the questions arise by reason of the so-called Miami "C" Lease on 640 acres in the South Pecan Lake Field in Cameron Parish, Louisiana. Sun had a 12.5% interest in the lease. Pan American Production Company, owning 50% of the lease, was the operator under an agreement of the holders of the lessee interests. Pan American had a contract to sell and deliver gas to United Fuel Gas Company. Pan American had committed its share of gas from the Miami "C" Lease to this contract. Sun, by letter agreement of October 1, 1954, authorized Pan American to dedicate Sun's gas to the United Fuel Gas contract, to deliver its gas and include it under the billings under the sales contract and to receive and remit to Sun its

[1]. The agreement provisions are:
"In the event that any Non-Operator does not exercise its right to take its share of gas in kind or of separately disposing of such gas, Operator shall have charge and control of the marketing of such production, and all of such production, whether sold to third parties or delivered to one of the parties hereto, shall be sold or delivered pursuant to sales contracts and division orders executed by the parties participating in such sales and deliveries. In the event any party not electing to take its share of production in kind fails or refuses to execute a sales contract and division order, which have been executed by other parties hereto, the Operator shall have the right to sell such party's production along with that of the other parties under said sales contract until such party shall either (1) make arrangements for other disposition of its share of gas at the wellhead and furnish Operator sufficient advance, written notice to enable Operator to give effect to such arrangement, or (2) execute a sales contract and division order already executed by other parties. At such times as any of the gas production from the Unit Area is being sold to third parties, each of the parties hereto shall be entitled to receive its proportionate part of the purchase price for such production direct from the purchaser. At such times as any Non-Operator is not taking its share of production in kind, Operator shall have the right to purchase such production for its own account at not less than the prevailing market price and shall account to Non-Operators therefor."

share of the proceeds.[2] Under this authorization sales were made.

The Commission's Order 174 required, among other things, that independent producers file their existing rate schedules and make no rate changes until after filing proposed changes (which the Commission might suspend pending a hearing), and required independent producers to apply for and obtain certificates of public convenience and necessity covering their sales of gas which were subject to regulation by the Commission. The Commission's Order 174 was superseded by its Order 174–A. Stanolind made rate schedule filings with respect to the sales of gas from Carthage Unit No. 16; Chicago Corporation filed rate schedules as to the Neal "A" Unit; R. Lacy, Inc. made a rate schedule filing covering the sales of gas from the Richardson Unit; and Pan American filed schedules covering the rates on the Miami "C" Lease gas sales. Sun also made rate schedule filings covering its interests in the several sales transactions, and also filed rate increase schedules. The Commission accepted these filings made by Sun. Sun applied for certificates of public convenience and necessity covering the sales of gas from each of the units or leases here involved. Certificates were granted on December 15, 1954, October 20, 1955, and May 28, 1956.

The practices herein outlined of effecting sales to pipeline companies of natural gas produced under unitized and pooled operations were common and prevailed generally throughout the industry. A single contract for the sale of gas might produce several, perhaps many, rate schedule filings. This condition not only added substantially to the increased burden of handling and processing by the Commission and its staff, but caused confusion and complications which the Commission regarded as impairing its efficiency and as unnecessary in carrying out the duties imposed upon it by the Act. On December 16, 1954, the Commission issued its Order 174–B. By this order the Commission provided that rate filings and applications for certificates of public convenience and necessity "may be made" by the unit operator where one or more wells are under co-ownership or where a group of producers are unitized for production or sale. It was also provided by Order 174–B that where filings were made by the operator the other parties to the operating arrangement "need not file hereunder." This did not seem wholly to solve the problem so far as the Commission was concerned for on May 5, 1955, it issued its order in a proceeding involving Midstates Oil Corporation and other gas producers who had not signed the contracts pursuant to which gas in which they had an interest was being sold. These producers, as well as the "operators" filed supplemental rate schedules. The Commission found that the public interest did not require and there was no substantial basis or justification for duplicate filings and the supplemental rate schedule filings of the non-operating producers were rejected.[3] A prior order

2. In this letter agreement it was stated:
"It is understood that Sun will retain its own responsibility for the handling of matters with the Federal Power Commission under the terms of the Natural Gas Act and Order 174–A, as same may be amended and modified, arising out of the disposition of its gas hereunder."

3. The reasons for its order were thus stated by the Commission:
"Thus, Midstates, Cities Service Oil Company, and Forest are not signatories to the above-described certain contracts and Garrett, Midwest, Rudman and Wood concur in but are not signatories to the above-described certain contracts. Question arises as to whether, in the reasonable administration of the Natural Gas Act such persons subject to the provisions of that Act who have not signed basic contracts between sellers and purchasers, as described above, should be permitted or required to file, or adopt by concurrence as its rate schedule the basic contract between seller and purchaser. No substantive rights of such persons, who are not signatories to such contracts, under the sales contracts in question are affected to their detriment or disadvantage if the basic filing by the operators are taken as the filings of the independent

of similar import had been issued by the Commission on March 10, 1955, in a case involving Humble Oil & Refining Co.

On September 27, 1956, the Commission issued its Order 190, 18 C.F.R. §§ 154.91, 157.23(c), which amended and supplemented Order 174–B. Among other things Order 190 provided that operators who had signed contracts for the sale of gas produced or processed should make rate schedule filings with respect to such sales and should make applications for certificates, that co-owners of the gas produced who had signed the sales contract may, but need not, make filings, and that co-owners who had not signed the sales contract may not file rate schedules.

On November 30, 1955, the Commission wrote a letter to Sun. In it reference was made to the Midstates order and the conclusions there reached. By the letter the rate schedule filings previously made by Sun which related to Carthage Unit 16 were rescinded and supplemental rate schedules were rejected. Sun made an application for a rehearing. The Commission, on January 27, 1956, denied the application by an order stating that the application presented no question of fact or principle of law not considered by the Commission when it issued its letter. In Case No. 16020 we are asked to review the Commission's actions of November 3, 1955, and January 27, 1956. Like action was taken as to Sun's rate schedule filings relating to the Neal "A" Unit and these are before us in Case No. 16021. The same steps were followed with respect to the Richardson Unit and the correctness of the Commission's action comes to us in Case No. 16213. The

procedures followed and the form of orders entered with respect to the Miami "C" Lease were somewhat different than in the other situations but the petition for review of the Commission's action presents, in Case 16410, the same questions as are raised in the other cases.

On June 15, 1956, the Commission vacated its order granting a certificate of public convenience and necessity to Sun on the Unit 16 gas sales and the certificate was cancelled. The basis for the order was that participants in unit operations who were not parties to the contracts under which sales were made were not entitled to certificates. Sun made an application for a rehearing of this order which the Commission denied. Sun, in Case 16321, seeks a reversal of the Commission's ruling. The Commission took similar action in cancelling the certificates which it had issued to Sun on the Neal "A" Unit, the Richardson Unit and the Miami "C" Lease. Its orders relating thereto are before us for review in Case No. 16548.

Sun presents both substantive and procedural questions. It contends that it is a natural-gas company and as such is under a duty and has a right to procure certificates of public convenience and necessity and make filings of rate schedules; that there is no justification for a distinction between those who have signed and those who have not signed a contract for the sale of natural gas, and in reaching a contrary determination the Commission exceeded its powers and abused its discretion; and that the cancellation of the rate schedule filings and the certificates without a hearing and

producers. Nor are the interests of the purchasers affected in any way since there can be no abandonment of service other than in the manner provided by the Natural Gas Act. It therefore, appears reasonable and proper in the public interest to limit rate filings so that the basic contract for sale and purchase may be taken as the rate schedule affecting all persons whose gas is sold under such basic contracts. Under the above-described contracts no person who is not a

party to any of the basic contracts can effect a change in price under any of the basic contracts. We can find no good reason for permitting Midstates, Cities Service Oil Company, Midwest, Forest, Garrett, Rudman and Wood to make filings, which are included in filings made by the sellers under the basic contracts, when the only possible effect would be to show on their own behalf the difference in volume of gas to which the rate schedule would be applicable as to each."

notice to Sun was violative of due process requirements, the Natural Gas Act and the Administrative Procedure Act, 5 U.S.C.A. § 1001et seq.

Pertinent to the inquiry we are to make are the provisions of the Natural Gas Act defining a natural-gas company,[4] requiring the filing of rate schedule,[5] requiring the procurement of certificates of public convenience and necessity,[6] and authorizing the making of regulations by the Commission.[7]

■ It may be noted that it is the *sale* of natural gas which is affected with a public interest, it is a person engaged in the *sale* that is a natural-gas company, and it is the rates which are charged for or in connection with *sales* that must be just and reasonable and which must be filed. The gas which was produced by or on behalf of Sun—gas of which it had ownership—was commingled with the gas of others. Its ownership was of an undivided share of the whole. It could have had its share severed from the mass and then made a sale or other disposition of it. It could have made a separate sale of its undivided portion of the gas. Sun did neither of these things. Instead, in each case it joined with its co-owners in an agreement which either authorized the making of a contract of sale or ratified a contract of sale of all of the gas production from the particular unit or lease. In no instance was Sun a party to the contract of sale and in no instance did Sun execute the contract of sale. The Commission has stated that it would be burdened with an unmanageable mass of rate schedule filings if every person with an undivided interest in the gas production from a unit or lease operation should file. In the cases before us involving four sales contracts there were sixteen ownership interests. The rule-mak-

4. "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale. 15 U.S.C.A. § 717a(6).

5. "Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time (not less than sixty days from June 21, 1938) and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services." 15 U.S. C.A. § 717c(c).

6. "No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: * * *" 15 U.S.C.A. § 717f(c).

7. "The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules and regulations as it may find necessary or appropriate to carry out the provisions of this act. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this act; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours." 15 U.S.C.A. § 717o.

ing power given to the Commission by Congress is ample to permit the Commission to make rules, regulations and orders appropriate to carry out the provisions of the Act. The necessity for classifications is recognized. No injury to Sun has been shown as the result of the rejection of its rate schedule filings or the cancellation of its certificates of public convenience and necessity. None is threatened so far as appears. There is no need to anticipate an injury not presently threatened and not shown to be something likely to arise in the future. Cf. Montana-Dakota Utilities Co. v. Federal Power Commission, 8 Cir., 1948, 169 F.2d 392, certiorari denied 335 U.S. 853, 69 S.Ct. 82, 93 L.Ed. 401. The rate filings required by the Act are to be made under such rules and regulations as the Commission may prescribe. 15 U.S.C.A. § 717c(a). We think that the Commission would not have exceeded its powers if it had restricted rate schedule filings of gas sales from a unitized or leasehold operation to the operator who, for the various co-owners and with their authority, made a contract of sale. That the Commission permits, without requiring, a duplicate filing by a non-operator signer owning an undivided share would not furnish a non-operator non-signer a ground for complaint as to the denial of a right to file in the absence of any showing that the classification was one which resulted in an injury to him. We agree with the Commission that each of the sales here involved made by an operator under an operating agreement could be properly treated as a single jurisdictional sale of the unit or leasehold gas production, and that each such sales contract could properly be the subject of a single rate filing. The same conclusion also applies to the applications for and granting of certificates of public convenience and necessity.

 The Commission, in its efforts to develop procedures and classifications which would permit it to process the volume of proceedings suddenly arising pursuant to the Phillips decision, moved from the ad hoc determinations in Midstates and Humble to its Order 190 which codified the rule of single filings. The action of the Commission in rescinding Sun's rate schedule filings was subsequent to the Midstates' determination but prior to the issuance of Order 190. However the Commission had given notice, on March 23, 1955, prior to rescinding Sun's filings, that it proposed to make a rule to prohibit or restrict duplicate filings. The ad hoc process of development of administrative procedures is not an improper one. American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103; Securities and Exchange Commission v. Chenery Corporation, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995, rehearing denied 332 U.S. 783, 68 S.Ct. 26, 92 L.Ed. 367. Sun, however, contends that where a formal rule has been promulgated, such as Order 174–B which permitted non-signing owners of gas interests to file rate schedules, the Commission could not, by an ad hoc order deprive it of that which the formal rule had given it, particularly where the order is entered without notice and without a hearing. But an administrative agency is not a slave of its rules. National Labor Relations Board v. Grace Co., 8 Cir., 1950, 184 F.2d 126. Ad hoc changes may be made and, in proper cases, may be applied retroactively. National Labor Relations Board v. National Container Corp., 2 Cir., 1954, 211 F.2d 525. In a particular case an administrative agency may relax or modify its procedural rules and its action in so doing will not be subjected to judicial interference in the absence of a showing of injury or substantial prejudice. National Labor Relations Board v. Monsanto Chemical Co., 8 Cir., 1953, 205 F.2d 763.

The effect of the Commission's orders of which Sun complains was substantially to reduce multiple rate filings by the elimination of filings by non-operators who had not signed the contract by which the gas, owned in part by them, was sold. Sun asserts that it has been deprived of rights of substance and that the deprivation has worked to its detriment and injury. The authorizing by it of the sale

by an operator of its undivided share of gas does not, it contends, justify the Commission in denying Sun the right to make its own filings and initiate or resist proposed rate changes. It suggests that it would be harmed by the failure of its operator to file rate schedules or rate changes or by the untimely filings by the operator. Sun urges that its proper rate formulae and the elements of which they are comprised may be different from those of the operator. Sun assumes that it might not be notified by either the Commission or the operator of proceedings or proposals by which it might be adversely affected. It believes that if it had notice or knowledge of a proposal or proceeding by which it might be adversely affected, it might not be permitted to assert its rights and claims by being allowed to intervene. Sun takes the position that although the operating agreements give it the right to sever and take in kind its share of gas and to make separate sales of it, the Commission's rescissions of its separate filings deprive it of this express contractual right. The ruling of the Commission requiring filings only by operators and permitting filings by other co-owners only if they were signers of sales contracts was a procedural ruling and it was no less so when the ruling, as to Sun, was made in specific orders rescinding its separate duplicate filings. It is not shown that the ruling has been or that it will be the means by which the substantial rights of the owners of gas, the sale of which is subject to regulations, will be adversely affected. We are unwilling to assume that the operators will advance their own interests to the prejudice of a non-operator co-owner. We do not believe that Sun will be without notice or knowledge of any proposed action which might affect its interests. We do not have any fear that the Commission will abuse its discretion by denying Sun the right to intervene in any proceeding where its rights of substance are involved and might be prejudiced if it were deprived of the right to participate. We cannot see that Sun is deprived of any contractual right reserved to it under the operating agreements. The regulations generated by Order 190 contain these provisions:

" * * * the non-signatory co-owner whose gas is being sold by the operator may, where he has reserved the right to do so, elect to take his gas in kind and dispose of it otherwise if and when there has first been obtained authorization therefor to the extent required by sections 7(b), and 7(c), or other applicable provisions of the Natural Gas Act, and filings have been made as required by section 4 thereof." 18 C.F.R. § 154.91(d).

We are unable to see any harm, injury or prejudice to Sun resulting from the Commission action which is here under attack.

■ ■ We come then to the final question of whether the failure of the Commission to give Sun notice and hold formal hearings before rescinding its rate schedule filings and canceling its certificates of public convenience and necessity requires the setting aside of the Commission's orders. Although Sun urges to the contrary, we do not think there was any fact question involved and hence no evidence would have been material. If the question was more than a question of administrative policy, and we doubt that it was, it was a question of law. We do not believe there was a case of an adjudication which was required by the statute "to be determined on the record after opportunity for an agency hearing" where notice is required by the Administrative Procedure Act. 5 U.S.C.A. § 1004. Nor do we think that the absence of notice has deprived Sun of due process as guaranteed by the Constitution. The only benefit that would have inured to Sun by notice and hearing would have been the privilege of making a legal argument before the Commission. We find no requirement in the Natural Gas Act for notice and hearing in such a situation. The opportunity to be heard on questions of law is

not an inherent element of procedural due process in the determination of a procedural question. Cf. Federal Communications Commission v. WJR, The Goodwill Station, Inc., 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353.

Sun has filed a motion in each of the cases numbered 16020, 16021, 16410 and 16548 to correct the record. Without extending this opinion for a discussion of the motions, we will merely say that they are not well founded and are denied.

The Commission acted within its powers; its orders which are under review were proper and are

Affirmed.