Trevor A. WALDRON, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 604, Docket 92–4021.

United States Court of Appeals, Second Circuit.

Argued Nov. 24, 1992.

Decided May 19, 1993.

Amended Opinion Feb. 22, 1994.

---

Joshua D. Rievman, Esq., New York, N.Y. (Douglas F. Broder, Coudert Brothers, New York, N.Y., of counsel), for Petitioner.

Diogenes P. Kekatos, Assistant United States Attorney, New York, N.Y. (Otto G. Obermaier, United States Attorney for the Southern District of New York, Gabriel W. Gorenstein, Assistant United States Attorney, James A. O'Brien, III, Special Assistant United States Attorney, New York, N.Y., of counsel), for Respondent.

Before: PIERCE, MINER and WALKER, Circuit Judges.

PIERCE, Circuit Judge:

Petitioner sought to have this Court review a decision of the Board of Immigration Appeals (the "BIA" or the "Board"), which upheld a decision of an immigration judge ("IJ"), which, in turn, found petitioner deportable because of two drug convictions and also denied his applications for suspension of deportation and registry. In an opinion, reported at 994 F.2d 71 (2d Cir.1993), we granted the petition for review, reversed the decision of the BIA and remanded the matter

to the Immigration and Naturalization Service (the "INS") for further proceedings. Post-filing submissions have caused us to reexamine the decision in this case. For the reasons set forth below, the earlier opinion is withdrawn and it is the decision of the panel that the action of the Board is upheld.

## BACKGROUND

In April 1970, Waldron, a native of Trinidad and a citizen of Trinidad and Tobago, entered the United States at Charlotte Amalie, in the United States Virgin Islands. It is unclear whether he entered with inspection. In April 1985, while Waldron was serving a prison sentence at the Fishkill Correctional Facility, the INS served him with an Order to Show Cause and Notice of Hearing, alleging that he had entered the United States without inspection, and charging him as deportable from the United States under § 241(a)(2) of the Immigration and Nationality Act of 1952 (the "Act"), 8 U.S.C. § 1251(a)(2) (1988). The INS subsequently lodged a Notice of Additional Charges of

Deportability under § 241(a)(11) of the Act, 8 U.S.C. § 1251(a)(11) (1988), alleging that Waldron had been convicted twice of possession of marijuana.[1]

Waldron's first deportation hearing was held on July 19, 1988,[2] before an IJ. Waldron appeared *pro se*, although he was reminded at the start of the proceedings by the IJ of his right to be represented by counsel. Waldron testified that he was currently incarcerated for a weapons possession conviction. He offered various reasons why he should not be deported and asked the IJ to allow him to remain in the United States because he had family in this country. Counsel for the INS then read into the record Waldron's criminal record. In an oral decision, the IJ determined that Waldron was deportable. The IJ also determined that, due to Waldron's criminal convictions, he was ineligible for any relief under the Act, specifically, suspension of deportation and registry, because he was unable to demonstrate "good moral character," as required by § 244[3] and § 249,[4] respectively.

1. Sections 241(a)(2) and (11) of the Act provided in pertinent part:

> Any alien in the United States ... shall, upon the order of the Attorney General, be deported who—
> ....
> (2) entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this chapter or in violation of any other law of the United States;
> ....
> (11) ... has been convicted of a violation of ... any law ... relating to a controlled substance (as defined in section 802 of title 21)[.]
> ....

8 U.S.C. §§ 1251(a)(2) and (11) (1988). With respect to deportation proceedings for which notice has been furnished to an alien on or after March 1, 1991, these sections have been amended and recodified, without material effect. *See* The Immigration Act of 1990, Pub.L. No. 101–649, §§ 602(a) and (d), 104 Stat. 4978, 5077–80, 5082 (1990) (codified as amended in 8 U.S.C. §§ 1251(a)(1)(B) and 1251(a)(2)(B)(i) (Supp. II 1990)). Because deportation proceedings were instituted against Waldron before March 1, 1991, 8 U.S.C. §§ 1251(a)(2) and (11) (1988) apply here.

The term "controlled substance," as defined in the Controlled Substance Act, includes marijuana. 21 U.S.C. §§ 802(6) and 812 (Schedule I(c)(10)) (1988).

2. Although the transcript and oral decision of this hearing are dated May 19, 1988, the BIA indicated in its October 16, 1990 decision that this was erroneous and that the hearing and decision were concluded on July 19, 1988.

3. Section 244(a) of the Act provides, in pertinent part:

> As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien ... who applies to the Attorney General for suspension of deportation and—
> (2) ... has been physically present in the United States for a continuous period of not less than ten years immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation, and proves that during all of such period he has been and is a person of good moral character....

8 U.S.C. § 1254(a)(2) (1988 & Supp. IV 1992).

4. Section 249 allows the Attorney General, in the exercise of his discretion to make a record of lawful admission for permanent residence in the case of any alien who establishes that he:

> (a) entered the United States prior to January 1, 1972;
> (b) has had his residence in the United States continuously since such entry;

Waldron, proceeding *pro se*, appealed from the IJ's decision to the BIA, arguing that he had not been afforded a fair hearing. On October 16, 1990, the BIA issued its decision stating that, since it was unable to determine from the record when the additional written factual allegations had been served on Waldron and whether he was advised, at that time, of his right to counsel, it could not ascertain if Waldron had made a knowing and intelligent waiver of his right to counsel and whether he should have been afforded additional time to meet the newly lodged factual allegations and charges. The BIA also noted that Waldron had not been given a proper opportunity to designate a country of deportation. Accordingly, further proceedings were ordered. In addition, the BIA directed that, in the event the decision on remand was adverse to Waldron, an appropriate order should be entered and the record certified to the BIA for review.

A second deportation hearing was held on January 31, 1991 at the Downstate Correctional Facility in Fishkill, New York, where Waldron was incarcerated. Once again, Waldron appeared *pro se*. He was served anew with the INS's Order to Show Cause and Notice of Additional Charges of Deportability, which lodged additional grounds of deportability against Waldron based upon his two marijuana convictions. Since Waldron indicated his desire to be represented by counsel, the hearing was adjourned to allow him the opportunity to obtain an attorney. The hearing resumed on March 14, 1991, but was again adjourned because Waldron had been unable to secure counsel.

Eventually, Waldron obtained legal representation and, on July 11, 1991, the hearing resumed. The INS did not pursue the charge that Waldron entered the country without inspection. Instead, the INS relied on Waldron's two marijuana convictions as

the basis for deporting him. Waldron contested those convictions, at one point claiming that he could not recall whether he had been convicted, and at another point stating that he refused to "concede" the charges. The IJ, relying upon two court convictions in conjunction with Waldron's "rap sheet," determined that Waldron's deportability had been established under § 241(a)(11) of the Act. Waldron designated the United Kingdom as the country of deportation. Waldron then applied for a suspension of deportation, pursuant to § 244, registry, pursuant to § 249, and an adjustment of status, pursuant to § 245.[5] However, because Waldron had been incarcerated continuously since April 1987 for criminal possession of a weapon, the IJ determined that Waldron was ineligible for registry and suspension of deportation relief because he was unable to demonstrate ten years of "good moral character." Moreover, according to the IJ, Waldron was ineligible to receive an adjustment in status because of his two marijuana convictions. Accordingly, Waldron was ordered deported from the United States.

Waldron, proceeding *pro se*, again appealed the IJ's decision to the BIA, this time alleging, *inter alia*, that the INS and the IJ abused their discretion by not notifying him of his right to contact diplomatic officials of his native Trinidad and by failing to certify his case to the BIA as directed by the BIA in its October 16, 1990 decision. On January 14, 1992, the BIA issued its decision dismissing the appeal. The BIA rejected all the grounds asserted by Waldron. With respect to the alleged failure of the INS and the IJ to notify Waldron of his right to contact consular authorities, the BIA concluded that since Waldron had failed to demonstrate that the preparation of his defense to the deportation charges had been prejudiced, he was not entitled to any relief. The Board further

---

(c) is a person of good moral character; and (d) is not ineligible to [sic] citizenship.
8 U.S.C. § 1259 (1988 & Supp. IV 1992).

5. Section 245(a) provides:
   The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully

admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.
8 U.S.C. § 1255(a) (1988 & Supp. IV 1992).

noted, in a footnote, that the failure to certify the case to it, as ordered by its October 16, 1990 decision, was harmless error. Finally, the BIA agreed with the IJ's conclusion that Waldron was not entitled to any relief under the Act because his continuous incarceration rendered him unable to demonstrate the requisite "good moral character."[6]

Waldron now petitions this Court to review the BIA's decision.

## DISCUSSION

On appeal, Waldron contends that a reversal of the BIA's decision is mandated under this Court's decision in *Montilla v. INS*, 926 F.2d 162 (2d Cir.1991), because the INS failed to follow its own regulations. The INS contends that a new hearing is not warranted because neither of the INS regulations in question, namely, 8 C.F.R. § 242.2(g), entitled "Privilege of communication," and 8 C.F.R. § 3.7, entitled "Notice of certification," apply to Waldron.[7] In the alternative, the INS argues that *Montilla* is easily distinguishable from the facts herein, and that, based upon its interpretation of its holding, *Montilla* should be limited in its reach.

## I. *Application of Regulations to Waldron*

■ Section 242.2(g) provides in pertinent part:

> Every detained alien shall be notified that he may communicate with the consular or diplomatic officers of the country of his nationality in the United States. Existing treaties require immediate communication with appropriate consular or diplomatic officers whenever nationals of the following countries are detained in exclusion or expulsion proceedings, whether or not requested by the alien, and, in fact, even if the alien requests that no communication be undertaken in his behalf[.][8]

The INS contends that § 242.2(g) cannot be interpreted as affording aliens, detained by authorities other than the INS, the right to notification of the privilege to contact diplomatic consular officials. Since Waldron was serving a criminal sentence in the custody of New York State at the time of his deportation proceedings, he was not, according to the INS, in the INS's apprehension, custody or detention and therefore the INS was not obligated to notify Waldron of his right to contact consular or diplomatic authorities of his native Trinidad and Tobago. In support of this position, the INS relies on two cases, *Severino v. Thornburgh*, 778 F.Supp. 5 (S.D.N.Y.1991) and *Fernandez–Collado v. INS*, 644 F.Supp. 741 (D.Conn.1986), *aff'd without opinion*, 857 F.2d 1461 (2d Cir.1987).

However, the INS's reliance on these cases is misplaced. In both *Severino* and *Fernandez–Collado*, the petitioners were incarcerated prisoners against whom detainers had been lodged by the INS, indicating that their convictions might subject them to deportation. Both petitioners sought writs of habeas corpus under 28 U.S.C. § 2241 to have the INS detainers removed. *See Severino*, 778 F.Supp. at 6; *Fernandez–Collado*, 644 F.Supp. at 742. Both courts found that the mere lodging of a detainer did not vest the INS with the requisite physical custody necessary to grant the habeas corpus relief. *Severino*, 778 F.Supp. at 6; *Fernandez–Collado*, 644 F.Supp. at 743–44. As the district court in *Fernandez–Collado* noted, a detainer is "merely a method of advising the prison officials to notify the I.N.S. of the petitioner's [impending] release or transfer.... The detainer expresses only the intention of the [I.N.S.] to make a determination of deportability[,] if and when[,] the subject of the notice becomes available at a later time." 644 F.Supp. at 743 n. 1.

Similarly, in *Campillo v. Sullivan*, 853 F.2d 593 (8th Cir.1988), *cert. denied*, 490 U.S.

---

**6.** According to the BIA decision, Waldron did not appeal from the IJ's conclusions with respect to Waldron's application for adjustment in status under § 245 of the Act.

**7.** As an initial matter, the INS contends that Waldron's claim under 8 C.F.R. § 242.2(g) is not properly before this Court because it was not raised until Waldron's second appeal to the BIA.

We disagree. While it is true that Waldron first raised this issue in his second appeal to the BIA, the BIA addressed the issue in that appeal, apparently excusing Waldron's failure to raise the issue previously. Accordingly, we also may consider the issue.

**8.** Trinidad and Tobago is one of the listed countries. *See* 8 C.F.R. § 242.2(g).

1082, 109 S.Ct. 2105, 104 L.Ed.2d 666 (1989), a prisoner against whom the INS had lodged a detainer sought habeas corpus relief to compel an immediate hearing and disposition of the deportation proceeding. The Eighth Circuit held that the "detainer ... does not purport to effect [sic] Campillo's status as a sentenced federal offender, but merely notifies prison officials that a decision regarding his deportation will be made by the INS at some future date." *Id.* at 595. Accordingly, the lodging of a detainer with prison officials did not amount to a taking into custody, technical or otherwise, of the petitioner. *Id.* at 596; *see also Roldan v. Racette*, 984 F.2d 85, 87–88 (2d Cir.1993) (collecting cases).

However, both *Campillo* and *Fernandez–Collado* explicitly drew a distinction from *Chung Young Chew v. Boyd*, 309 F.2d 857, 865 (9th Cir.1962) and *Slavik v. Miller*, 89 F.Supp. 575, 576 (W.D.Pa.), *aff'd*, 184 F.2d 575 (3d Cir.1950), *cert. denied*, 340 U.S. 955, 71 S.Ct. 566, 95 L.Ed. 688 (1951), two cases in which the INS was deemed to have "technical custody" over petitioners. *See Campillo*, 853 F.2d at 596; *Fernandez–Collado*, 644 F.Supp. at 743. What sets *Campillo, Severino* and *Fernandez–Collado* apart from *Chung Young Chew* and *Slavik* is that, in the former cases, although the INS lodged detainers against the respective prisoners, it had not commenced deportation proceedings. In sharp contrast, in *Chung Young Chew* and *Slavik*, the INS issued warrants for the arrest of the prisoners (which was a jurisdictional prerequisite to deportation proceedings at the times involved in these cases, *see Johns v. Department of Justice*, 653 F.2d 884, 889 n. 7 (5th Cir.1981)), held deportation proceedings and made determinations of deportability, and filed detainers that, in contrast to detainers under current practice, *required* the deportees to be turned over to INS custody for deportation—all while the petitioners were incarcerated by an authority other than the INS. *See Chung Young Chew*, 309 F.2d at 859; *Slavik*, 89 F.Supp. at 576.

Herein, by relying on *Severino* and *Fernandez–Collado*, the INS implicitly argues that Waldron was no more in the INS's custody than were the *Severino* and *Fernan-dez–Collado* petitioners. We find this position untenable. Clearly, the extent of the INS's custody over Waldron was greater than in cases where the INS merely files a detainer requesting that it be notified when the prisoner is about to be released. Had the INS taken physical custody of Waldron upon his release and held deportation proceedings, he undeniably would have been a detained alien and his right to be informed of the privilege to consult with the consular authorities of his country would have been triggered. We see no reason why the INS should be able to circumvent Waldron's rights simply by holding deportation proceedings in the state prison where he is incarcerated and claiming that he is not in INS custody. Waldron's need to know of his right to seek assistance from the consular authorities of his country before being deported does not vary according to the authority that detains him at the time deportation proceedings are held. We therefore hold that whenever a deportation proceeding is held with respect to an incarcerated individual, he will be deemed to be a detained alien for purposes of § 242.2(g). Waldron therefore clearly falls within § 242.2(g).

■ Also at issue in this case is 8 C.F.R. § 3.7, which provides in pertinent part:

Whenever in accordance with the provisions of § 3.1(c), a case is required to be certified to the Board, the alien or other party affected shall be given notice of certification. A case shall be certified only after an initial decision has been made and before an appeal has been taken. If it is known at the time the initial decision is made that the case will be certified, the notice of certification shall be included in such decision and no further notice of certification shall be required.... [T]he notice shall inform the party affected that the case is required to be certified to the Board and that he or she has the right to make representation before the Board, including the making of a request for oral argument and the submission of a brief.... The case shall be certified and forwarded to the Board by the Service office or Office of the Immigration Judge having administrative jurisdiction over the

case upon receipt of the brief, or upon the expiration of the time within which the brief may be submitted, or upon receipt of a written waiver of the right to submit a brief.

Section 3.1(c) provides that "[t]he Commissioner, or any other duly authorized officer of the Service, any Immigration Judge, or the Board may ... require certification ... to the Board [of cases arising under the Board's appellate jurisdiction]."

The INS argues that Waldron's claim under § 3.7 is without merit because that provision only applies to cases in which no appeal has been taken and the time specified for filing a notice of appeal has expired. Since Waldron timely appealed from the IJ's second decision to the BIA, the INS argues that § 3.7 does not apply to him.

We think the INS views § 3.7 too narrowly. Section 3.7, in conjunction with § 3.1(c), permits the BIA to reach a meritorious question presented by an untimely or otherwise questionable appeal by taking the case by certification. *See Garcia v. Boldin,* 691 F.2d 1172, 1181 n. 17 (5th Cir.1982). By its very terms, though, § 3.7 also applies to cases in which it is known, at the time an initial decision is made by an IJ, that the case is to be certified. Such was the case herein. In its October 16, 1990 decision, the BIA directed that "[s]hould a decision on remand be adverse to [Waldron], an appropriate order shall be entered and the record shall be certified to us for review." There can be no doubt that the decision on remand was adverse to Waldron as he was ordered deported and was denied any relief from the deportation order. Therefore, as quoted above, § 3.7's provision that "[i]f it is known at the time the initial decision is made that the case will be certified [to the BIA for review], the notice of certification shall be included in such decision ..." became applicable to Waldron. The mere fact that, after the decision was delivered without the notice of certification, Waldron salvaged the situation and filed a timely appeal did not lessen the applicability of § 3.7 to Waldron.

Accordingly, we now turn to the underlying merits of Waldron's claims.

## II. *The* Montilla *Precedent*

■ The INS argues that even if § 242.-2(g) and § 3.7 apply to Waldron, and even if the IJ failed to comply with these regulations, in order to obtain relief, Waldron should be required to demonstrate prejudice from the agency's lack of compliance. In *Montilla v. INS,* we rejected the "prejudice" standard where the INS failed to adhere to its own regulations regarding an alien's right to counsel in a deportation hearing and held that the alien was not required to show prejudice in that circumstance to obtain relief. *Montilla,* 926 F.2d at 169. *Montilla* focused its analysis on the issue of the degree of compliance required by an IJ "with INS regulations designed to safeguard an alien's right to counsel, even when those regulations may be more stringent than required by the due process clause of the Fifth Amendment." *Montilla,* 926 F.2d at 163–64. Specifically, the INS argues that *Montilla* "sets forth a broad rule requiring remand whenever any regulation 'for the benefit' of the alien is violated," citing *Montilla,* 926 F.2d at 169. Having interpreted *Montilla* thusly, the INS proceeds to urge us to limit *Montilla* because the panel "erroneously adopted an absolute 'no prejudice' standard."

The INS misconstrues the holding of *Montilla.* *Montilla* addresses itself to the INS's failure to adhere to its own regulations concerning an alien's right to counsel, which, as even the INS recognizes, is a "fundamental right derived from the Sixth Amendment right to counsel in criminal cases and the Fifth Amendment right to due process in civil cases, and enshrined in section 292 of the Act, 8 U.S.C. § 1362." As the Supreme Court has stated, "[a] court's duty to enforce an agency regulation is most evident when compliance with the regulation is mandated by the Constitution or federal law." *United States v. Caceres,* 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979). *Montilla*'s holding is limited to its express terms and it may not be interpreted as suggesting an "absolute 'no prejudice' standard" *whenever* a challenged regulation is for the benefit of an alien. Any such interpretation is unwarranted given the limited holding in *Montilla.*

We agree with the INS that the instant case is distinguishable from *Montilla* in that the privilege of communication [9] with consular officials, and the certification of one's case to the BIA for review are not fundamental rights derived from the Constitution or federal statutes, such as the right to counsel, but are merely provisions created by agency regulations. The INS urges this Court to adopt the standard set forth by the Ninth Circuit in *United States v. Calderon–Medina*, 591 F.2d 529 (9th Cir.1979). Under *Calderon–Medina*, a "[v]iolation of a regulation renders a deportation unlawful only if the violation prejudiced interests of the alien which were protected by the regulation." 591 F.2d at 531. *Calderon–Medina* addressed the deprivation of rights created by agency regulations rather than fundamental rights derived from the Constitution or a federal statute. *Id.* at 530. The *Calderon–Medina* court, in fact, addressed a predecessor of one of the regulations at issue herein, and determined that the INS's failure to follow its own regulations did not invalidate a deportation proceeding without a showing that the violation potentially affected the outcome of the proceeding. *Id.* at 532. We, however, decline to adopt the *Calderon–Medina* approach, which requires a demonstration of prejudice irrespective of whether the subject regulation was designed to protect a fundamental right derived from the Constitution or a federal statute.

We believe that the reasons articulated by the *Montilla* Court for adopting a "no prejudice" standard are particularly important where fundamental rights derived from the Constitution or federal statutes are implicated, such as the right to counsel. *See Montilla*, 926 F.2d at 169. However, we believe that, when there is a regulation which relates to less fundamental, agency-created rights and privileges, the wholesale remand of cases, where no prejudice has been shown to result from the INS's failure to strictly adhere to its regulations, would place an unwarranted and potentially unworkable burden on the agency's adjudication of immigration cases. As we noted in *Economic Opportunity Comm'n, Inc. v. Weinberger*, "an ad-

ministrative agency is not a slave of its rules." 524 F.2d 393, 400 (2d Cir.1975) (citation and internal quotation marks omitted). We conclude, therefore, that when a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid and a remand to the agency is required. This may well be so even when the regulation requires more than would the specific provision of the Constitution or statute that is the source of the right. *See Montilla*, 926 F.2d at 167 (citing *Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974)). On the other hand, where an INS regulation does not affect fundamental rights derived from the Constitution or a federal statute, we believe it is best to invalidate a challenged proceeding only upon a showing of prejudice to the rights sought to be protected by the subject regulation.

Applying the standard we have just articulated to this case, we conclude that neither § 242.2(g) nor § 3.7 are regulations which implicate fundamental rights with constitutional or federal statutory origins, as was the case in *Montilla*. Section 242.2(g) was adopted to ensure compliance with the Vienna Convention on Consular Relations (the "Convention"). *See Calderon–Medina*, 591 F.2d at 531 n. 6. Article 36 of the Convention provides, *inter alia*, that aliens shall have the freedom to communicate with consular authorities of their native country. *See* 115 Cong.Rec. 30,945, 30,948 (1969). Although compliance with our treaty obligations clearly is required, we decline to equate such a provision with fundamental rights, such as the right to counsel, which traces its origins to concepts of due process. Similarly, § 3.7 primarily addresses the procedure for notifying an alien that the case is being certified to the BIA. *See* 8 C.F.R. § 3.7. This regulation is likewise not grounded in any underlying fundamental constitutional or statutory right.

With respect to the issue of prejudice, Waldron has neither claimed nor demonstrated that the INS's failure to notify him of the

---

**9.** The caption of 8 C.F.R. § 242.2(g) reads, "Priv-    ilege of communication."

privilege to communicate with consular authorities prejudiced him in his preparation of a defense to the deportation charges. Similarly, the IJ's failure to include a notice of certification in the July 11, 1991 decision, as required by § 3.7, was hardly prejudicial since Waldron actually did take an appeal from that decision. Moreover, the INS has convincingly demonstrated that Waldron is ineligible for relief from deportation and that a remand of this case to the BIA to correct technical errors that did not affect either the outcome or the overall fairness of the proceeding is not indicated, and would be an inappropriate use of limited agency resources.

## CONCLUSION

The petition for review is granted and the decision of the BIA is affirmed.

WALKER, Circuit Judge, concurring:

I agree with the majority that the BIA's deportation order must stand notwithstanding the IJ's failure to notify petitioner of his right to contact consular authorities and to certify an appeal to the BIA because the petitioner must demonstrate prejudice and has not done so. I also feel, however, that *Montilla's* broad ruling that reversal follows *per se* whenever the INS fails to adhere to a regulation that implicates a fundamental right cannot be supported. Because the rule may someday be revisited, I express my views separately.

I have no quarrel with the result in *Montilla*—a reversal where petitioner was not told of his right to be represented by retained counsel. It is entirely consistent with a rule of prejudicial error to hold that some procedural failures, *i.e.*, those that affect fundamental constitutional rights, are so serious that prejudice will be presumed. Yet I believe that even in such situations the government could rebut the presumption of prejudice by establishing that the violation could not possibly have altered the result.

I am convinced that *Montilla's* articulation of a strict no prejudice standard even on the facts of that case is unsound and in conflict with the precedent of this court. In *Eco-*

*nomic Opportunity Commission v. Weinberger,* 524 F.2d 393 (2d Cir.1975), we examined the issue of whether the Department of Health, Education & Welfare's failure to adhere strictly to hearing procedures mandated by the Equal Opportunity Act required reversal of the resulting proceedings. In holding that strict compliance was not required, we noted that

> "an administrative agency is not a slave of its rules.... In a particular case an administrative agency may relax or modify its procedural rules and its action in so doing *will not be subjected to judicial interference in the absence of a showing of injury or substantial prejudice.*"

*Id.* at 400 (emphasis added) (quoting *Sun Oil Co. v. F.P.C.,* 256 F.2d 233, 239 (5th Cir.) (citations omitted), *cert. denied,* 358 U.S. 872, 79 S.Ct. 111, 3 L.Ed.2d 103 (1958)). Similarly, in *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2d Cir.), *cert. denied,* 382 U.S. 861, 86 S.Ct. 121, 15 L.Ed.2d 99 (1965), we held that "[a]lthough the harmless error statute, 28 U.S.C. § 2111, is not in terms applicable to review of administrative action, we perceive no reason why the salutary principle embodied in it should not be so applied...." The holding in *Montilla* is also at odds with the law in several other circuits. *See Ortiz–Salas v. INS,* 992 F.2d 105, 106 (7th Cir.1993) ("Harmless errors no more justify reversal in a deportation case than in a criminal case."); *Arzanipour v. INS,* 866 F.2d 743, 746 (5th Cir.) (refusing to reverse where IJ's failure to inform petitioner of his right to appeal "did not result in substantial prejudice"), *cert. denied,* 493 U.S. 814, 110 S.Ct. 63, 107 L.Ed.2d 30 (1989); *Delgado–Corea v. INS,* 804 F.2d 261, 263 (4th Cir.1986); *United States v. Cerda–Pena,* 799 F.2d 1374, 1377 & n. 3 (9th Cir.1986).

It is interesting to note that when we held in *Weinberger* that an agency need not always strictly adhere to its regulations, we distinguished *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), the case primarily relied upon by the *Montilla* majority. In *Accardi,* the BIA allegedly failed to follow regulations requiring it to exercise its own discretion in reviewing Accardi's application to suspend

deportation, after the Attorney General circulated to the BIA a list of persons, including Accardi, that he wanted deported. The *Weinberger* court pointed out that in *Accardi*, "the administrative decision-making process was conducted in a patently undeliberative manner *and prejudiced substantial interests of the complaining party.*" *Weinberger*, 524 F.2d at 400 n. 9 (emphasis added); *see also McCallin v. United States*, 180 Ct.Cl. 220, 234, 1967 WL 8869 (1967) (citing *Accardi* as a case "involving substantial noncompliance with regulations which greatly prejudiced plaintiffs therein and, in effect, denied them procedural due process"). Thus, *Weinberger* cites *Accardi* as a prejudice case, yet *Accardi* was used to support *Montilla*'s proposition that an agency's failure to follow its own rules requires reversal even absent a showing of prejudice.

I think *Weinberger*'s view of *Accardi* is closer to the mark. The alleged actions of the Attorney General and the BIA in *Accardi* involved intentional circumvention of the applicable regulations, a circumstance not present in *Montilla*. In any event, *Accardi* provides scant support for the holding in *Montilla*.

Our holding in *Weinberger* also relied, in part, on the judicial review provisions of the APA, which expressly require reviewing courts to take due account of the rule of prejudicial error. *See* 5 U.S.C. § 706; *Weinberger*, 524 F.2d at 399. Although the Immigration and Nationality Act contains separate procedures for judicial review of deportation and exclusion orders, *see* 8 U.S.C. § 1105a, the rule of prejudicial error embodied in the APA must still inform our review of INS orders. *Consolidated Gas Supply Corp. v. FERC*, 606 F.2d 323, 328–29 (D.C.Cir.1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). In fact, given that the clear purpose of § 1105a was to expedite the deportation process by eliminating dilatory litigation practices, judicial review of INS orders that does not account for harmless errors cannot be reconciled with that enactment. *See* H.Rep. No. 1086, 87th Cong., 1st Sess. (1961), *reprinted in* 1961 U.S.C.C.A.N. 2950, 2969, 2973–74; *Foti v. INS*, 375 U.S.

217, 226, 84 S.Ct. 306, 312, 11 L.Ed.2d 281 (1963).

Even if the rule of prejudicial error were not required by statute, *Montilla*'s *per se* regime unjustifiably rejects the "salutary principle" embodied in harmless error review; namely, "to preserve review as a check upon arbitrary action and essential unfairness in trials ... without giving men fairly convicted the multiplicity of loopholes which any highly rigid and minutely detailed scheme of errors, especially in relation to procedure, will engender and reflect in a printed record." *Kotteakos v. United States*, 328 U.S. 750, 760, 66 S.Ct. 1239, 1245, 90 L.Ed. 1557 (1946). In its place we have substituted a technocratic rule that requires reversal even when the alien was not prejudiced by the procedural deviation or denied the right to correct any perceived errors on administrative review. It is indeed anomalous that a deportee already convicted of a crime can obtain automatic reversal of a deportation order when an IJ fails to follow a regulation derived from constitutional or statutory origin, while a criminal defendant, who enters the system presumed to be innocent, remains subject to the rule of harmless error even when raising a violation of the Constitution itself. *See Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S.Ct. 1246, 1262, 113 L.Ed.2d 302 (1991); *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

I think that where INS procedures have deprived an alien of a fundamental right, the presence of prejudice will be so clear that it may be presumed, and the court may act accordingly in providing a remedy to the aggrieved alien. However, in many, if not most cases, the lack of prejudice resulting from a procedural error will be so self-evident that reversing the INS's decision and postponing deportation is a circuitous and wasteful route to the same result. *See Nani v. Brownell*, 247 F.2d 103, 104 (D.C.Cir.) (per curiam), *cert. denied*, 355 U.S. 870, 78 S.Ct. 119, 2 L.Ed.2d 75 (1957); *see also INS v. Abudu*, 485 U.S. 94, 107–08, 108 S.Ct. 904, 913–14, 99 L.Ed.2d 90 (1988). Perpetuating the *per se* rule of *Montilla–Waldron* as it presently stands can only continue to squan-

der judicial and executive resources, and will simultaneously accord aliens unprecedented rights in the immigration arena—an area over which the executive and legislature have virtually plenary control. *See Jay v. Boyd,* 351 U.S. 345, 353–54, 76 S.Ct. 919, 924–25, 100 L.Ed. 1242 (1956) (relief from deportation order is in all cases a matter of grace); *cf. Landon v. Plasencia,* 459 U.S. 21, 34–35, 103 S.Ct. 321, 330–31, 74 L.Ed.2d 21 (1982) ("The role of the judiciary [in deportation proceedings] is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.").

I concur.