**UNITED STATES of America,**
**Appellee,**

v.

**Alejandro Bustos DE LA PAVA,**
**Defendant–Appellant.**

**Docket No. 00–1116.**

United States Court of Appeals,
Second Circuit.

Argued July 13, 2001.

Decided Oct. 15, 2001.

---

Moira E. Casey, Douglaston, NY, for Appellant.

Roberto Finzi, Assistant United States Attorney (Elliott B. Jacobson, Assistant United States Attorney, of counsel; Mary Jo White, United States Attorney, on the brief), United States Attorney's Office for the Southern District of New York, New York, NY, for Appellee.

Before CABRANES, POOLER, and SACK, Circuit Judges.

Judge SACK concurs in a separate opinion.

JOSÉ A. CABRANES, Circuit Judge:

Defendant Alejandro Bustos De La Pava appeals from a judgment of the United States District Court for the Southern District of New York (Richard M. Berman, *Judge*) convicting him, following his plea of guilty, of illegally reentering the United States after having been deported subsequent to a conviction for an aggravated felony, in violation of 8 U.S.C. § 1326(b)(2). On appeal, De La Pava argues that (1) the indictment to which he pleaded guilty was

defective because it did not contain an element of his offense-namely, that he was an "alien"; (2) he received ineffective assistance of counsel because his counsel in the District Court did not move to dismiss the indictment on the basis that the Government had failed to comply with the consular notification provision of the Vienna Convention on Consular Relations ("Vienna Convention"), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261, 1967 WL 18349 (ratified Nov. 24, 1969); and (3) the District Court erred in declining to depart downward from the otherwise applicable sentencing guideline.

For the reasons stated below, we find no merit in any of these arguments and therefore affirm the judgment of the District Court.

## I

The following facts are not in dispute. In 1984, De La Pava, a citizen of the Republic of Colombia, was sentenced to concurrent terms of imprisonment after two convictions relating to the possession and sale of cocaine. Following his release from prison, De La Pava was deported from the United States to Colombia in April 1993.

In September 1996, De La Pava was arrested in New York City and convicted of criminal possession of a controlled substance in the third degree in the Supreme Court of the State of New York, New York County. Following his term of imprisonment for that conviction, the Immigration and Naturalization Service ("INS") arrest-ed De La Pava, and counsel was assigned to him pursuant to the Criminal Justice Act.

On February 23, 1999, a federal grand jury returned a one-count indictment charging De La Pava with illegally reentering the United States after having been deported subsequent to a conviction for an aggravated felony, in violation of 8 U.S.C. § 1326(b)(2).[1] The indictment read in pertinent part as follows:

> From at least on or about September 26, 1996 up to and including on or about February 9, 1999, in the Southern District of New York and elsewhere, ALEJANDRO BUSTOS DE LA PAVA . . ., the defendant, unlawfully, willfully, and knowingly did enter, and was found in, the United States after having been deported from the United States subsequent to a conviction for the commission of an aggravated felony . . . and without having obtained the permission of the Attorney General of the United States to re-enter the United States.

Absent from the indictment was an explicit allegation that De La Pava was an "alien."

On July 8, 1999, De La Pava pleaded guilty to the charge in the indictment before Magistrate Judge James C. Francis IV. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, Judge Francis confirmed that De La Pava was competent to plead, and ensured that the plea was not the product of any force, threat or promises apart from the plea agreement and was the result of De La Pava's own free will.[2] At Judge Francis's request, the

---

1. Section 1326(b)(2) provides that an alien, who reenters the United States after having been removed "subsequent to a conviction for commission of an aggravated felony, . . . shall be fined under . . . Title [18], imprisoned not more than 20 years, or both." 8 U.S.C. § 1326(b)(2).

2. Rule 11 of the Federal Rules of Criminal Procedure provides in relevant part:

 **(c) Advice to Defendant.** Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:

Government also informed De La Pava of the elements of the offense that the Government would have to prove if the case went to trial. The Government informed De La Pava that it would have to show, among other things, that "the defendant is an alien." When asked by Judge Francis if he understood that "this is what the government would have to prove if [the case] went to trial," De La Pava answered, "Yes, your Honor."

Following De La Pava's plea of guilty, Judge Berman accepted the plea and then held a sentencing hearing on December 4, 1999. At the hearing, Judge Berman determined that De La Pava's adjusted offense level was 21 and that his Criminal History Category was IV, which, under the Sentencing Guidelines, resulted in a sentencing range of 57 to 71 months' imprisonment. *See* U.S.S.G. sentencing tbl.

De La Pava moved for a downward departure from the applicable sentencing range on the grounds that (1) his Criminal History Category of IV overstated the seriousness of his criminal record; and (2) there were unwarranted and systematic sentencing disparities for similarly-situated defendants in various federal district courts. Judge Berman noted, in response, that De La Pava's criminal record contained "an extensive listing of arrests and convictions of serious felony crimes," and explained that the sentencing disparities were the product of the appropriate exercise of prosecutorial discretion in particular cases. Accordingly, Judge Berman held that a downward departure was not warranted and sentenced De La Pava principally to imprisonment for 65 months and a term of three years of supervised release.

On appeal, De La Pava challenges his conviction and sentence on three grounds. He argues that (1) his indictment was defective because it did not contain the word "alien," an element of his offense of conviction; (2) he received ineffective assistance of counsel because his counsel in the District Court did not move to dismiss the indictment on the basis that the Government failed to comply with the consular notification provision in Article 36 of the Vienna Convention; and (3) the District Court erred in declining to depart downward from the Sentencing Guidelines. We write principally to address the first two arguments.

## II

### A. *Sufficiency of the Indictment*

De La Pava argues that his conviction should be vacated because the indictment to which he pleaded guilty failed explicitly to mention an essential element of his offense—namely, that he was an "alien." The issue here is whether this omission constitutes a basis to vacate his conviction.

(1) the nature of the charge to which the plea is offered . . .; and
(2) . . .
(3) that the defendant has the right to plead not guilty or to persist in that plea if it has already been made, the right to be tried by a jury and at that trial the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses, and the right against compelled self-incrimination; and
. . . .

**(d) Insuring That the Plea is Voluntary.** The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the attorney for the government and the defendant or the defendant's attorney.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an "indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." FED.R.CRIM.P. 7(c)(1). An indictment must sufficiently inform the defendant of the charges against him and provide enough detail so that he may plead double jeopardy in a future prosecution based on the same set of events. *See United States v. Goodwin,* 141 F.3d 394, 401 (2d Cir.1997). An indictment, however, need not be perfect, and common sense and reason are more important than technicalities. *See id.* at 401 ("[T]he precision and detail formerly demanded are no longer required, imperfections of form that are not prejudicial are disregarded, and common sense and reason prevail over technicalities.)" (quoting CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2d § 123, at 347 (1982)).

The scrutiny given to an indictment depends, in part, on the timing of a defendant's objection to that indictment. *See Goodwin,* 141 F.3d at 401; *United States v. Wydermyer,* 51 F.3d 319, 324 (2d Cir. 1995). Where, for example, a defendant raises an objection after a verdict has been rendered, we have held that an indictment should be interpreted liberally, in favor of sufficiency. *See Wydermyer,* 51 F.3d at 324–25.

Here, De La Pava did not challenge the sufficiency of the indictment before he pleaded guilty or before judgment was entered. Moreover, De La Pava does not contend that he lacked notice of the elements of the charges against him. In these circumstances, we interpret the indictment liberally in favor of sufficiency, absent any prejudice to the defendant.

We conclude that the indictment, construed liberally, sufficiently alleged that De La Pava was an alien. The indictment stated that De La Pava, "without having obtained the permission of the Attorney General of the United States to reenter the United States," unlawfully reentered and was "found" in the United States "after having been deported from the United States." A person cannot be deported from the United States unless he or she is an alien, and only an alien needs the permission of the Attorney General to reenter the United States. *See, e.g., Ng Fung Ho v. White,* 259 U.S. 276, 284, 42 S.Ct. 492, 66 L.Ed. 938 (1922) ("[J]urisdiction in the executive to order deportation exists only if the person arrested is an alien."); *In re Milanovic,* 162 F.Supp. 890, 897 n. 2 (S.D.N.Y.1957) ("[D]eportation signifies the transfer of an alien, excluded or expelled, from this to a foreign country."), *aff'd sub nom. United States v. Murff,* 253 F.2d 941 (2d Cir.1958). Moreover, only an alien—as opposed to a citizen—would be characterized as being "found" in the United States against the law. Accordingly, we hold that the language of the indictment, liberally construed, adequately alleged that De La Pava was an alien. *Cf. Goodwin,* 141 F.3d at 401–02 (holding that an indictment, liberally construed, sufficiently alleged a nexus to interstate commerce where it charged the defendant with laundering $4 million in narcotics proceeds through the use of cashier's checks and through the delivery of money to individuals who would arrange remittance to narcotics suppliers).

We also can discern no prejudice to De La Pava. In the allocution prior to De La Pava's plea, the Government specifically informed De La Pava that one of the elements of the charged offense is that the defendant be an alien. Judge Francis then asked De La Pava if he understood that "this is what the government would have to prove" if the case went to trial, and

De La Pava answered, "Yes, your Honor." Accordingly, De La Pava cannot contend now that he lacked notice of this element of his offense, or that he could not plead double jeopardy in a future prosecution.

## B. *Ineffective Assistance of Counsel*

■ De La Pava next argues that his conviction should be vacated because he received ineffective assistance of counsel. According to De La Pava, the Government violated Article 36 of the Vienna Convention by not advising him of his right to notify the consular post of Colombia of his arrest, and his counsel in the District Court rendered ineffective assistance by not moving to dismiss the indictment on this basis. We find no merit in this argument.

■ On a direct appeal claiming ineffective assistance of trial counsel, we may (1) "decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent § 2255 petition"; (2) remand the claim to the district court for fact-finding; or (3) decide the claim. *United States v. Pena,* 233 F.3d 170, 174 (2d Cir. 2000). De La Pava's Sixth Amendment claim—a claim based solely on trial counsel's failure to make a motion to dismiss an indictment—is both "straightforward[ ]" and susceptible to resolution as a matter of law. Accordingly, we can and will decide

the claim. *Cf. id.* (deciding a claim of ineffective assistance of counsel on direct appeal based, *inter alia,* on its "straight-forwardness" and a sufficiently developed record).

■ To establish a claim of ineffective assistance of counsel, a convicted defendant must show that (1) his counsel's performance fell below an objective standard of reasonableness; and (2) but for the deficiency, there is a reasonable probability that the outcome of the proceeding would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687–96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because, as we discuss below, a violation of Article 36 of the Vienna Convention on Consular Relations is not a basis for the dismissal of an indictment, De La Pava has not met either prong of this test.

Article 36(1)(b) of the Vienna Convention provides that the authorities of a "receiving state"—here, the United States—shall, without delay, inform any detained foreign national of his right to have the "consular post" of a "sending state"—here, the Republic of Colombia—notified of his detention. *See* Vienna Convention, art. 36(1)(b) (the "consular-notification provision").[3] To ensure compliance with this provision, the Department of Justice and the INS have issued regulations to the same effect. *See* 28 C.F.R. § 50.5;[4] 8

---

**3.** Article 36 reads in relevant part:

 1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

 . . . .

 (b) if he so requests, the competent authorities of the receiving State [here, the United States] shall, without delay, inform the consular post of the sending State [here, Colombia] if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested,

in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

**4.** The Justice Department regulation, 28 C.F.R. § 50.5, provides in relevant part:

 (a) This statement is designed to establish a uniform procedure for consular notification where nationals of foreign countries are arrested by officers of this Department on charges of criminal violations. . . .

 (1) In every case in which a foreign national is arrested the arresting officer shall

C.F.R. § 236.1(e).[5]

 The Supreme Court has left open the question of whether the consular-notification provision creates judicially enforceable individual rights. *See Breard v. Greene*, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998). As a general matter, however, there is a strong presumption against inferring individual rights from international treaties. The Supreme Court long ago explained: "A treaty is primarily a compact between independent nations[;][i]t depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it." *Head Money Cases*, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884). We have noted that, "even where a treaty provides certain benefits for nationals of a particular state[,] ... it is traditionally held that any rights arising out of such provisions are, under international law, those of the states and ... individual rights are only derivative

through the states." *United States ex. rel. Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir.1975); *see also Garza v. Lappin*, 253 F.3d 918, 924 (7th Cir.2001) ("[A]s a general rule, international agreements, even those benefitting private parties, do not create private rights enforceable in domestic courts."); RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES, § 907 cmt. a. ("International agreements ... generally do not create private rights or provide for a private cause of action in domestic courts....").

 The preamble to the Vienna Convention supports the view that the Convention created no judicially enforceable individual rights: "[T]he purpose of [the] privileges and immunities [created by the treaty] is not to benefit individuals but to ensure the efficient performance of functions by consular posts." Vienna Convention, pmbl.[6] Moreover, paragraph 1 of Article 36 itself specifically states that the provisions of that Article are framed

inform the foreign national that his consul will be advised of his arrest unless he does not wish such notification to be given. If the foreign national does not wish to have his consul notified, the arresting officer shall also inform him that in the event there is a treaty in force between the United States and his country which requires such notification, his consul must be notified regardless of his wishes and, if such is the case, he will be advised of such notification by the U.S. Attorney.

(2)....
(3)....

(b) The procedure prescribed by this statement shall not apply to cases involving arrests made by the Immigration and Naturalization Service in administrative expulsion or exclusion proceedings, since that Service has heretofore established procedures for the direct notification of the appropriate consular officer upon such arrest....

5. The INS regulation, 8 C.F.R. § 236.1(e), provides in relevant part:

Every detained alien shall be notified that he or she may communicate with the con-

sular or diplomatic officers of the country of his or her nationality in the United States.... When notifying consular or diplomatic officials, Service officers shall not reveal the fact that any detained alien has applied for asylum or withholding of removal.

6. We also note that, in response to questions posed by the Court of Appeals for the First Circuit in *United States v. Nai Fook Li*, 206 F.3d 56 (1st Cir.2000) (en banc), the State Department explained that, in its view, the Vienna Convention created state-to-state rights and obligations, not judicially enforceable individual rights. *See id.* at 63–64. We are required to accord substantial deference to the State Department's view in interpreting the Vienna Convention. *See id. See generally, El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty.").

"[w]ith a view to facilitating the exercise of *consular functions* relating to nationals of the sending State." Vienna Convention, art. 36(1) (emphasis added). This is additional evidence that the purpose of Article 36 was to protect a *state's right* to care for its nationals.[7]

The Senate Report concerning the Vienna Convention on Consular Relations also noted that "[t]he following factor[ ] weighed in the Committee's decision: [ ] The Convention does not change or affect present U.S. laws or practice." S. Exec. Rep. No. 91–9 at 2 (1969). The State Department, in response to questions from the Senate on the treaty, stated: "The Vienna Consular Convention does not have the effect of overcoming Federal or State laws beyond the scope long authorized in existing consular conventions...." *Id.* at 18.

■■■ Even if we assume *arguendo* that De La Pava had judicially enforceable rights under the Vienna Convention—a position we do not adopt—the Government's failure to comply with the consular-notification provision is not grounds for dismissal of the indictment. As the First Circuit has explained,

> [e]ven stronger than the presumption against private rights of action under

international treaties is the presumption against the creation of rights enforceable by ... the dismissal of an indictment. Historically, such [a remedy has] been available only in cases implicating the most fundamental of rights.

*United States v. Nai Fook Li,* 206 F.3d 56, 61 (1st Cir.2000) (en banc) (emphasis added), *cert. denied,* 531 U.S. 956, 121 S.Ct. 379, 148 L.Ed.2d 292 (2000). The dismissal of an indictment is an "extraordinary remedy" reserved only for extremely limited circumstances implicating fundamental rights. *Id.* at 62.

■■■ We have previously held that the consular-notification provision of the Vienna Convention and its related regulations do not create any "fundamental rights" for a foreign national. *See Waldron v. INS,* 17 F.3d 511, 518 (2d Cir.1994) ("Although compliance with our treaty obligations clearly is required, we decline to equate [the consular notification] provision [of the Vienna Convention] with fundamental rights."). Accordingly, we join the three other Courts of Appeals that have addressed this issue and hold that the Government's failure to comply with this provision is not a basis to dismiss an indictment. *See United States v. Page,* 232 F.3d 536, 540–41 (6th Cir. 2000) *cert. denied,* —— U.S. ——, 121 S.Ct. 2202, 149 L.Ed.2d 1032; *United States v. Cordoba–*

---

7. In fact, the emphasis on the rights of states is reflected in the debate over Article 36 between states that desired an unconditional obligation on the part of the receiving state to notify the sending state after an arrest of a national of the sending state and those states that wanted notification only if the national so requested. *See* Luke T. Lee, Vienna Convention on Consular Relations 109–111 (1966). One reason that some states desired to make notification dependent upon the request of the sending state's national was a fear that an "excessive administrative burden would be imposed upon a receiving state with a large number of alien immigrants dispersed throughout the country." *Id.* at 110. *See also Official Records,* United Nations Confer-

ence on Consular Relations, Vienna, March 4—April 22, 1963, U.N. Doc. A/Conf.25/16 (1963) at 83 (statement of the representative of Canada, a co-sponsor of the final version of Article 36). On the relevance of the negotiating and drafting history of treaties, the Supreme Court has observed: "Because a treaty ratified by the United States is not only the law of this land ... but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (*travaux préparatoires*) and the postratification understanding of the contracting parties." *Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996).

*Mosquera,* 212 F.3d 1194, 1195–96 (11th Cir.2000) (per curiam), *cert. denied,* 531 U.S. 1131, 121 S.Ct. 893, 148 L.Ed.2d 800 (2001); *Nai Fook Li,* 206 F.3d at 61–62; *see also United States v. Lombera–Camorlinga,* 206 F.3d 882, 887–88 (9th Cir. 2000) (en banc) (holding that the failure to comply with Article 36(1)(b) did not warrant exclusion of post-arrest statements made by a foreign detainee to the prosecution), *cert. denied,* 531 U.S. 991, 121 S.Ct. 481, 148 L.Ed.2d 455 (2000).

In light of this holding, De La Pava cannot persuasively argue that his counsel's failure to move to dismiss the indictment under Article 36 of the Vienna Convention constitutes ineffective assistance of counsel. First, this failure did not fall below an objective standard of reasonableness. At the time of De La Pava's hearings before the District Court, no Court of Appeals had held that this provision of the Vienna Convention formed a basis for a motion to dismiss an indictment, *Smith v. Singletary,* 170 F.3d 1051, 1054 (11th Cir. 1999) ("[A]s an acknowledgment that law is no exact science, the rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized . . . ." (internal quotation marks and citation omitted)); *Nelson v. Estelle,* 642 F.2d 903, 908 (5th Cir. Unit A Apr.1981) ("[C]ounsel is normally not expected to foresee future new developments in the law."), and indeed, nothing in the history of the Convention and its ratification would have given counsel reason to believe that such a motion had the slightest probability of success.

Second, it is not likely that, but for the alleged deficiency on the part of his counsel, there is a reasonable probability that the outcome of De La Pava's proceedings would have been different. Because a for-eign national cannot seek dismissal of an indictment on the basis of an alleged failure of the Government to notify him of his right to consular notification under the Vienna Convention, any motion by De La Pava's counsel to this effect would have been futile.

### C. *Downward Departure*

■■■■ As a final matter, we decline to review the District Court's decision not to depart downward from the Sentencing Guidelines. "It is well established in this Circuit that a court's decision not to depart from the Guidelines is normally not appealable." *United States v. Lainez–Leiva,* 129 F.3d 89, 93 (2d Cir.1997) (brackets omitted) (quoting *United States v. Brown,* 98 F.3d 690, 692 (2d Cir.1996)). De La Pava has not argued—much less shown— that any of the exceptions to this rule apply here. *See id.* (explaining that a Court of Appeals has discretion to review a decision not to depart downward if a violation of law occurred, the Guidelines were misapplied, or the refusal to depart downward was based on a mistaken conclusion that the District Court lacked authority to depart downward). Accordingly, we decline to review the District Court's decision not to depart downward.

### III

In sum, we hold that (1) the indictment sufficiently alleged all the elements of De La Pava's offense; (2) De La Pava's counsel in the District Court was not constitutionally ineffective; and (3) the District Court's decision not to depart downward from the Sentencing Guidelines is not reviewable on this appeal.

The judgment of the District Court is affirmed.

SACK, Circuit Judge, concurring:

I agree entirely with parts I, II A., II C., and III of the majority opinion. With respect to part II B., I agree with the majority's conclusion that De La Pava's counsel's failure to move to dismiss the indictment under Article 36 of the Vienna Convention does not constitute ineffective assistance of counsel. As the majority points out, *ante* at 165, we have held that the consular-notification provision of the Convention does not create "fundamental" rights for foreign nationals. *Waldron v. INS*, 17 F.3d 511, 518 (2d Cir.1993). The government's failure to comply with Article 36 therefore does not constitute grounds for the dismissal of an indictment against a foreign national, *see United States v. Morrison*, 449 U.S. 361, 364–65, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), and De La Pava's counsel's failure to raise this issue therefore does not rise to the level of "ineffective assistance" under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). But the majority strongly suggests, further, that "the Convention created no judicially enforceable individual rights." Ante at 164. Although this statement and the corresponding discussion, based on minimal briefing, seem to me clearly to be *dicta*, I see no reason even to appear to decide so broad and potentially sensitive an issue of international law. As the majority recognizes, "The Supreme Court has left open the question of whether the consular notification provision creates judicially enforceable rights." *Ante* at 164 (citing *Breard v. Greene*, 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998)). I would explicitly do the same.

If push came to shove, I might come to agree with the majority that the Convention does not generally give rise to individ-ual rights. But we have not been pushed, let alone shoved.