PAMELA K. CHEN, United States District Judge
Defendant Jaime Reyes Nunez ("Reyes Nunez") is charged under 8 U.S.C. §§ 1326(a) and (b)(1) with illegal reentry into the United States subsequent to the entry of a deportation order in 2006. Reyes Nunez moves to dismiss the indictment pursuant to 8 U.S.C. § 1326(d) on the basis of a fundamental error in his removal proceeding. For the reasons stated below, the Court grants Reyes Nunez's motion and dismisses the indictment.
BACKGROUND
Defendant Reyes Nunez was born in El Puerto de la Libertad, on the southern coast of El Salvador on June 10, 1988. (Def's. Mot. to Dismiss ("Def's. Mot."), Dkt. 16, at 2.) At that time, El Salvador was in the midst of a civil war, and Reyes Nunez's parents decided to move the family to Honduras shortly after his birth, settling in a small farming village in the state of Yoro. (Id. at 2-3.) Reyes Nunez's father worked as a farmer and his mother sold food to local laborers. (Id. at 3.) Reyes Nunez's father left the family in 1994 and the family was homeless periodically over the next few years. (Id. ) In 1998, following Hurricane Mitch, which battered the state of Yoro, Reyes Nunez's mother left for the United States to find work, and Reyes Nunez went to live with his uncle, and later, a local landowner named Don Jose Truchero in the municipality of El Progreso. (Id. at 3-4.)
Around this time, the transnational gang MS-13 began to recruit Reyes Nunez and encourage him to commit criminal acts. His paternal uncle, Efrain Reyes, was murdered by the gang in 1998. (Id. at 6.) Reyes Nunez resisted the gang and was violently attacked on numerous occasions as a result. (Id. ) The attacks prompted him to move back to El Puerto de la Libertad in El Salvador, but MS-13 had an active presence there too, and the harassment continued. (Id. at 7.) His father, living in the United States, was contacted by a gang member who threatened to "come after" Reyes Nunez if his father did not pay extortion money. (Id. ) Reyes Nunez moved back to Honduras and attended a trade school, but was again targeted by the gang upon his return. (Id. )
In April of 2006, at the age of 17, Reyes Nunez swam across the Rio Grande River to enter the United States. (Id. at 8.) He was apprehended by U.S. Customs and Border Patrol Agents ("CBP"). (Id. ) He admitted to the agents that he was "a native and citizen of El Salvador by birth," that he entered the United States illegally, and that he "had no documents to remain in the United States legally." (Id. ) Reyes Nunez was detained in a holding cell with "at least 20 other undocumented people"
*236 and was given a Notice of Custody Determination, which stated that Reyes Nunez would be detained by Immigration and Naturalization Service ("INS") "pending a final determination by the immigration judge in [his] case." (Id. at 8-9.) Reyes Nunez signed that document, along with a Notice to Respondent, which stated that he would "be advised by the immigration judge before whom [he] appear[s], of any relief from removal for which [he] may appear eligible." (Id. at 9.) His signature appears under the statement, "To expedite a determination in my case, I request an immediate hearing." (Id. )
Reyes Nunez also signed a Request For Disposition of Salvadorans, checking next to two paragraphs, one in English and one in Spanish, that stated, in relevant part: "I wish to request a hearing before an immigration judge to determine whether I may remain in, or be removed from the United States. I understand that if I wish to request political asylum I must request a hearing." (Id. at 9.) The form also stated, in pertinent part:
Right to Apply for Political Asylum
If you fear persecution because of your race, religion, nationality, membership in a particular social group, or political opinion, you may request political asylum. If you wish to apply for political asylum you should advise the officer who gave you this notice. An immigration judge will decide if you will be given or denied political asylum.
Right to Request Voluntary Departure
If you want to return to El Salvador, you may ask to be allowed to depart on the first available transportation. By agreeing to depart voluntarily, you give up your right to a deportation hearing and your right to apply for political asylum. If you request to depart voluntarily and then change your mind at any time before you actually go home, you may still request a hearing before a judge. You may also make a request to the judge at the hearing to depart voluntarily.
(Notice of Rights to Salvadorans 4/26/06, Dkt. 17-10, at 9-10.)
Reyes Nunez was criminally prosecuted pursuant to an initiative called Operation Streamline, an enhanced prosecution initiative in Del Rio, Texas, in which "Border Patrol refer[red] aliens entering the United States illegally for the first time or attempting re-entry to DOJ for criminal prosecution." (Def's. Mot., at 11.) A few days after his arrest, Reyes Nunez appeared in front of a U.S. Magistrate Judge in Del Rio, for a hearing on his alleged misdemeanor of unlawful entry in violation of 8 U.S.C. § 1325. (Id. at 10-11.) Reyes Nunez received counsel from a Criminal Justice Act ("CJA") attorney, Robert Garza, who was appointed to represent multiple defendants on the docket on the same day. (Id. at 11.) The Magistrate Judge addressed a "crowd of defendants as a group", with the translation being provided through headphones to the defendants. (Id. at 12.) The group "pled guilty en masse." (Id. at 13.) On May 3, 2006, Reyes Nunez was sentenced to 90 days' imprisonment. (Government's Opposition ("Gov. Opp'n"), Dkt. 19, at 5.)
On June 15, 2006, Reyes Nunez signed a second Request for Disposition of Salvadorans, checking a paragraph in Spanish where he admitted to being in the country illegally, waiving his right to a hearing before an immigration judge ("IJ"), and asking to return to his home country. (Notice of Rights to Salvadorans 6/15/06, Dkt. 17-13, at 12.) He also signed a Stipulated Request For Order/Waiver of Hearing ("Stipulated Removal"), which stated that he understood the consequences of signing the Stipulated Removal, including the fact that he would be removed from the country *237 and that he was waiving his right to appeal the written order of removal. (Def's. Mot., at 13.) The Stipulated Removal stated, in pertinent part:
I do not wish to apply for relief from removal pursuant to the Immigration and Nationality Act (hereinafter the Act). I am NOT seeking the relief of voluntary departure, political asylum, withholding of removal, adjustment of status, registry, review of a termination of conditional resident status, review of a denial or revocation of temporary protected status, family unity benefits, legalization benefits, cancellation of removal, naturalization, or any other possible relief or other benefits under the Act.
(Stipulated Removal, Dkt. 17-13, at 5.)
Reyes Nunez stated that he signed these documents because an immigration officer told him it "would speed up my deportation if [he] signed it." (Def's. Mot., at 13.) An immigration officer certified that he had read the form to Reyes Nunez in Spanish and that Reyes Nunez indicated that he "had no fear of return to his ... native country." (Gov. Opp'n., at 7.) Reyes Nunez did not have an immigration attorney at any point in his 2006 removal proceedings or any time thereafter. (Def's. Mot., at 15.)
The order removing Reyes Nunez was entered on July 7, 2006 ("2006 Removal Order"). (Id. ) The removal order from the IJ states that, "[u]pon the basis of respondent's admissions, I have determined that the respondent is subject to removal on the charge(s) contained in the Notice to Appear.... Respondent has made no application for relief from removal." (Order of the Immigration Judge, Dkt 17-13, at 3.) This was the only statement that the IJ made in the removal order.
Reyes Nunez re-entered the United States three times thereafter and was deported two of those times. Each time, the removal order was a reinstatement of the 2006 Removal Order. (Gov. Opp'n., at 7-9.)
Reyes Nunez's first post-2006 removal occurred after he was arrested in October 2008 in New York County for robbery in the Second Degree. He pled guilty to the offense in August 2009 and was sentenced to time served. (Id. at 7.) On August 17, 2009, he was transferred to Department of Homeland Security custody and deported on November 13, 2009. (Id. at 7-8.)
His second post-2006 removal occurred after he was apprehended by CBP on April 29, 2010, having just swum across the Rio Grande River. (Id. at 8.) In a sworn statement in Spanish, Reyes Nunez stated that he did not have "any fear of persecution or torture" if he were to be removed from the United States. (Id. ) On June 23, 2010, he pled guilty to illegal reentry in violation of 8 U.S.C. §§ 1326(a) and (b)(1), and was sentenced to 37 months' imprisonment soon thereafter. He finished his sentence and was removed to El Salvador on February 8, 2013.
Reyes Nunez re-entered the United States again some time before April 30, 2017, when he was arrested for driving without a license in Middleton, Pennsylvania. On August 3, 2017, Reyes Nunez was apprehended by immigration officers in Queens, New York. (Id. at 9.) When asked by an immigration officer in Spanish why he had come to the United States, he responded that he was "afraid." (Id. ) However, he also responded "no" when the officer asked whether he had "any fear of persecution or torture should [he] be removed from the United States." (Id. ) Reyes Nunez also told the officer, "If you're going to deported [sic] me, do it as soon as possible. I need to see what I am going to do with my life." (Id. )
*238 On August 24, 2017, Reyes Nunez was charged with illegal reentry. He was indicted on one count of illegal reentry in violation of 8 U.S.C. § 1326(d) on September 6, 2017. Reyes Nunez now moves to dismiss the indictment. (Def's. Mot., Dkt. 16.) The government filed an opposition on May 16, 2018. (Gov. Opp'n, Dkt. 19.) The Court held oral argument on June 12, 2018. Thereafter, the Court requested, and the parties submitted, supplemental briefing on the issue of whether the 2006 Removal Order was deficient under 8 C.F.R. § 1003.25(b) because the IJ had not determined whether Reyes Nunez's waiver of rights was voluntary, knowing, and intelligent. (See Government's Supplement ("Gov. Supp."), Dkt. 21; Defendant's Supplement ("Def's. Supp."), Dkt. 22.)
LEGAL STANDARDS
I. Standard for Dismissal of an Indictment
"A motion to dismiss an indictment must satisfy a high standard." U.S. v. Brooks , No. 06-CR-550 (JS), 2009 WL 3644122, at *2 (E.D.N.Y. Oct. 27, 2009) (citations and internal quotations omitted). This is because "[a]n indictment ... need not be perfect, and common sense and reason are more important than technicalities." United States v. De La Pava , 268 F.3d 157, 162 (2d Cir. 2001) (citation omitted). A court must "accept [ ] the facts alleged in the indictment as true and determine[ ] only whether the indictment is 'valid on its face.' " Brooks, 2009 WL 3644122, at *2 (quoting Costello v. United States , 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956) ).
II. Standard for Challenging the Validity of a Deportation Order
The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1326(a), criminalizes the entry, attempted entry, or presence of a deported or removed alien in the United States. The statute nonetheless affords an alien the ability to defend against a charge of illegally reentering the United States following deportation by challenging the validity of the underlying deportation order on which the charge is predicated. 8 U.S.C. § 1326(d) ; see United States v. Scott , 394 F.3d 111, 116 (2d Cir. 2005). The Supreme Court first clarified this principle in United States v. Mendoza-Lopez , finding that "where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding." 481 U.S. 828, 837-38, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987).
While "[t]he dismissal of an indictment is an 'extraordinary remedy,' reserved only for limited circumstances implicating fundamental rights," De La Pava , 268 F.3d at 165, a defendant charged with illegal reentry under 8 U.S.C. §§ 1326(a) and (b)(1) may collaterally attack the validity of the deportation order underlying his prosecution through a pre-trial motion brought under Federal Rule of Criminal Procedure 12. See United States v. Calderon , 391 F.3d 370, 372 (2d Cir. 2004) (affirming dismissal of an indictment alleging illegal reentry on the ground that defendant had shown the underlying deportation order was invalid).
The Second Circuit has explained the hurdles a defendant must overcome if he is to succeed in collaterally attacking the validity of a deportation order under 8 U.S.C. § 1326(d). See United States v. Fernandez-Antonia , 278 F.3d 150, 157 (2d Cir. 2002). To prevail on such a challenge, a defendant must demonstrate that "(1) [he] exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation *239 proceedings at which the order was issued improperly deprived [him] of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." Id. (citing 8 U.S.C. § 1326(d) ). "The requirements are conjunctive," and a defendant's failure to establish any one part forecloses collateral attack and dismissal of the indictment on the basis of the invalidity of the underlying deportation order. Id. Even so, a defendant can satisfy the first two prongs of § 1326(d) by showing that immigration officials in the underlying removal proceeding acted with fundamental unfairness and violated a regulation designed to protect an alien's right to judicial review. See Calderon , 391 F.3d at 374-75 (excusing the administrative exhaustion requirement where Defendant's waiver of his right to an administrative appeal was not "knowing and intelligent").
DISCUSSION
In his motion, Reyes Nunez argues that the deportation proceedings were fundamentally unfair because he was not informed of his rights to political asylum or voluntary departure, and that the particular circumstances surrounding his execution of the written waiver of a hearing before the IJ rendered his waiver unknowing and involuntary. (Def's. Mot., at 1, 28.) Reyes Nunez claims that he requested a hearing with an immigration judge, but then was sent weeks later to see a criminal judge for a guilty plea "en masse" without any opportunity to ask or answer individualized questions. (Id. at 12-13.) Reyes Nunez asserts that the IJ ultimately failed to comply with § 1003.25(b) by not ascertaining whether Reyes Nunez's written waiver was knowing, voluntary, and intelligent. (Def's. Supp., at 1-2.)
The government responds that Reyes Nunez's removal proceedings were fundamentally fair because he was repeatedly presented with documents explaining his rights, including the right to seek "asylum" and "voluntary departure." (Gov. Opp'n, at 16.) The government emphasizes that the record includes affirmations from CBP officials that Reyes Nunez had been read, and understood, the contents of the documents he was presented to sign and that he had no fear of return to his home country. (Id. ) While conceding that the IJ failed to expressly find on the record that Reyes Nunez's waiver was voluntary, knowing, and intelligent, the government nonetheless argues that the record "supports an implicit finding that Defendant's waiver was voluntary, knowing and intelligent" and that the actions of the IJ "did not prejudice the right sought to be protected by the regulation." (Gov. Supp., at 1.)
I. Fundamental Unfairness Under § 1326(d)
The Court begins its analysis with fundamental unfairness because a defendant can satisfy the first two prongs of § 1326(d) by showing that immigration officials violated a regulation designed to protect an alien's constitutional or statutory rights. See Calderon , 391 F.3d at 374-75. In order for an alien to substantiate a deportation order's fundamental unfairness under § 1326(d)(3), he must show " 'both a fundamental procedural error and prejudice resulting from that error.' " United States v. Williams , 733 F.3d 448, 455 (2d Cir. 2013) (quoting United States v. Cerna , 603 F.3d 32, 40-41 (2d Cir. 2010) ). The defendant-alien bears the burden of showing fundamental unfairness. See United States v. Daley , 702 F.3d 96, 100 (2d Cir. 2012).
A. Fundamental Procedural Error
To determine whether there was a fundamental procedural error in this case, the *240 Court must assess whether the IJ violated 8 C.F.R. § 1003.25(b), which provides: "If the alien is unrepresented, the Immigration Judge must determine that the alien's waiver [of a removal hearing] is voluntary, knowing, and intelligent." The Court must also consider whether such an error implicated Reyes Nunez's fundamental rights. See Waldron v. INS , 17 F.3d 511, 518 (2d Cir. 1993) ("[W]hen a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid ...").
Reyes Nunez argues that his fundamental rights were violated when the IJ failed to determine if his waiver was voluntary, knowing, and intelligent. Although the Second Circuit has not opined on this specific issue, the Supreme Court has broadly held that obtaining an invalid waiver of judicial review violates due process. Mendoza-Lopez , 481 U.S. at 840, 107 S.Ct. 2148 (finding that although a deportee may waive his right to judicial review of his deportation order, that waiver must be "considered or intelligent," otherwise, the deportee is "deprived of judicial review" in violation of due process).
As a general matter, § 1003.25(b) regulates stipulated requests for removal and allows an IJ to enter an order of removal without a hearing and in the absence of the parties. This regulation also provides, however, that "[i]f the alien is unrepresented, the Immigration Judge must determine that the alien's waiver [of a removal hearing] is voluntary, knowing and intelligent." 8 C.F.R. § 1003.25(b). Reyes Nunez was not represented by counsel when he signed the Stipulated Removal form, waiving his right to appeal the deportation order. Reyes Nunez signed a certification acknowledging that he had read the form, and that the form was also read to him in a language he understood. Reyes Nunez initialed each paragraph. The immigration officer also signed the form, certifying that he had explained the contents and meaning of the document to Reyes Nunez in a language which he understood. The IJ then entered the removal order, stating: "[u]pon the basis of respondent's admissions, I have determined that the respondent is subject to removal on the charge(s) contained in the Notice to Appear.... Respondent has made no application for relief from removal." (Order of the Immigration Judge, at 3.) The IJ made no other statements on the removal order.
It is undisputed that Reyes Nunez was not represented by an attorney at the time he signed the waiver and that the IJ did not make an express finding that Reyes Nunez's waiver was voluntary, knowing, and intelligent. (See Gov. Supp., at 1.) The IJ also neglected to include any language indicating that Reyes Nunez's waiver was voluntary, knowing, and intelligent beyond the single statement that the IJ had "determined that the respondent is subject to removal on the charge(s) contained in the Notice to Appear." (Order of the Immigration Judge, at 3.) The Court disagrees with the government's argument that the record supports an "implicit finding" that Reyes Nunez's waiver was voluntary, knowing, and intelligent. (Gov. Supp., at 1.) Reyes Nunez, an uncounseled alien, whose native and only language is Spanish, faced a distinct disadvantage trying to navigate the bureaucratic tangle of immigration law. See Drax v. Reno , 338 F.3d 98, 99 (2d Cir. 2003) (noting the "labyrinthine character of modern immigration law-a maze of hyper-technical statutes and regulations"). Reyes Nunez's choice to sign a multitude of forms waiving his rights, including the Stipulated Removal and Request for Disposition of Salvadorans, did *241 not absolve the IJ of his responsibility to ensure that an uncounseled alien's waiver was valid. The IJ's failure to determine the validity of Reyes Nunez's waiver violated § 1003.25(b).
Having found that the IJ committed a procedural error by not complying with § 1003.25(b), the Court now turns to whether this error implicated Reyes Nunez's fundamental rights. The parties recognize that the Second Circuit has not expressly ruled on this question. Yet the parties disagree on how to interpret Second Circuit precedent concerning fundamental rights in the immigration context. Reyes Nunez relies on the reasoning in United States v. Copeland , 376 F.3d 61 (2d Cir. 2004) to argue that § 1003.25(b) implicates a fundamental right derived from the Constitution or a federal statute. In contrast, the government relies on the reasoning in Waldron v. INS , 17 F.3d 511, 518 (2d Cir. 1993) and Nolasco v. Holder , 637 F.3d 159 (2d Cir. 2011) to argue that Reyes Nunez's fundamental due process rights were not implicated.
The Court rejects the government's effort to apply or extend the holdings in Waldron and Nolasco to this case. In Waldron , the Second Circuit upheld an IJ's decision to deport the defendant, even though the INS had violated its regulations by not informing the defendant of his right to communicate with diplomatic officers and not notifying him that his case had been certified by the Board of Immigration Appeals ("BIA"). The Court held that these procedural violations did not warrant remand because they "[did] not affect fundamental rights derived from the Constitution or a federal statute," and there was no prejudice as a result. Waldron , 17 F.3d at 518. Specifically, the Second Circuit found that 8 C.F.R. § 242.2(g), which affords consular rights to ensure compliance with the Vienna Convention on Consular Relations, and 8 C.F.R. § 3.7, which addresses the procedure for notifying an alien that the case is being certified by the BIA, are "not grounded in any underlying fundamental constitutional or statutory right." Id.
In Nolasco , the Second Circuit addressed the INS's failure to serve a Notice to Appear on a minor petitioner in accordance with 8 C.F.R. § 103.5a(c)(2)(ii). The Second Circuit held that the failure to serve the minor did not implicate fundamental rights and was not prejudicial because the Notice to Appear was ultimately served on the minor's parents. Nolasco , 637 F.3d at 164.
The Court finds that neither Waldron nor Nolasco forecloses a finding that the due process associated with discretionary relief under 8 C.F.R. § 1003.25(b) is a fundamental right. An IJ's failure to determine whether a defendant's waiver of his rights was voluntary, knowing, and intelligent is different in kind and magnitude from the procedural errors in Waldron and Nolasco . See Waldron , 17 F.3d at 518 (explaining that although ensuring compliance with the United States' treaty obligations is "required," it does not implicate "fundamental rights, such as the right to counsel, which traces its origins to concepts of due process."); Nolasco , 637 F.3d at 164 (explaining that if the government deprived the minor of a "meaningful opportunity to participate in her removal proceedings, that could implicate the minor alien's fundamental rights," however, a "defect in service, standing alone, does not"). Here, the IJ's failure was not a mere "defect in service" or a matter pertaining to the United States's consular obligations. In deciding whether or not to waive his rights, Reyes Nunez made significant due process decisions without the advice of counsel. The IJ had an obligation to protect *242 Reyes Nunez's constitutional rights[1] by instructing him on the applicable law and regulations. Additionally, Waldron left open the specific possibility that the Circuit could later recognize other fundamental procedural errors, like the one here. Waldron , 17 F.3d at 518 (noting that a deportation proceeding is invalid even where "the regulation requires more than would the specific provision of the Constitution or statute that is the source of the right"). Section 1003.25(b) is one such regulation; it requires an IJ to safeguard the fundamental right of due process by determining whether a defendant's waiver of a removal hearing was proper, which the IJ did not do here.
The Court agrees with Reyes Nunez that the Second Circuit's reasoning in Copeland supports a finding that a violation of § 1003.25(b) implicates a fundamental right. In Copeland , the panel held that an IJ's failure to advise a defendant of a right to seek discretionary relief under 8 U.S.C. § 212(c),[2] can, if prejudicial, be fundamentally unfair. Copeland , 376 F.3d at 71. The Copeland panel explained that, "a ruling by an IJ that misleads an alien into believing that no relief exists falls into a different category because of the special duties of an IJ to aliens." Id. The court stated that if IJs did not accurately explain the law, pro se aliens would "have no way of knowing what information was relevant to their cases and would be practically foreclosed from making a case against removal." Id. The court acknowledged that there was "disagreement among the circuits over whether the failure to inform an alien of his right to seek discretionary relief can ever be a fundamental procedural error." Id. (noting that Fourth, Fifth, Sixth, Eighth, Tenth, and Eleventh Circuits have held that there is no fundamental procedural error, while the Ninth Circuit has held that there can be). The court in Copeland ultimately aligned with the Ninth Circuit, holding that "a failure to advise a potential deportee of a right to seek Section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(d)(3)." Id.
The Fifth Circuit has also explored the circuit split discussed in Copeland . In United States v. Cordova-Soto , 804 F.3d 714 (5th Cir. 2015), the Fifth Circuit denied a motion to dismiss an illegal reentry indictment because the IJ's failure to make an express finding that the defendant's signed Stipulated Removal was voluntary, knowing, and intelligent did not amount to a due process violation. The court held that discretionary immigration relief is only "available within the broad discretion of the Attorney General" and "is not a right protected by due process." Id. at 723. The Fifth Circuit relied on United States v. Lopez-Ortiz , 313 F.3d 225 (5th Cir. 2002) for its ruling that an alien's eligibility for discretionary relief from removal "is not a liberty or property interest deserving of due process protection." Id. The Fifth Circuit explained that a majority of the circuits have held that there is no constitutional right to be informed of eligibility for discretionary relief,[3] except for the Second *243 and Ninth Circuits, which have found otherwise. Id. (citing Copeland , 376 F.3d at 70-73 and United States v. Arrieta , 224 F.3d 1076, 1079 (9th Cir. 2000) (explaining that IJ's failure to inform the alien of eligibility for relief from removal violated due process) ). Although the government urges this Court to adopt the ruling in Cordova-Soto , doing so would not accord with the law of this Circuit, as explicitly acknowledged in Copeland . The Court declines to apply Cordova-Soto to this case.
Even though courts in the Second Circuit have not specifically opined on whether an IJ's failure to determine if an alien has voluntarily, knowingly, and intelligently waived the right to a removal hearing violates due process, district courts in the Ninth Circuit have uniformly held that it does. See United States v. Contreras , No. 08-CR-03414 (BTM), 2009 WL 703396, at *2-3 (S.D. Cal. Mar. 17, 2009) (holding that waiver was improper where "the IJ's order clearly does not include a specific determination that Defendant waived his right to a hearing."); United States v. Gomez-Hernandez , No. 08-CR-6005 (FVS), 2008 WL 2096876, at *4 (E.D. Wash. May 16, 2008) (holding defendant's due process rights violated where he signed a stipulated form and the IJ never specifically inquired into whether his waiver of counsel was knowing, intelligent, and voluntary); United States v. Trujillo-Romero , No. 2:09-CR-0500 (RLH) (LRL), 2010 WL 762185, at *3 (D. Nev. Mar. 5, 2010) ("The Removal Order does not contain an express statement that the Immigration Judge determined whether Trujillo's waiver of hearing was 'voluntary, knowing, and intelligent,' ... nor does the record indicate that Trujillo's waiver of his right to appeal was in any way 'considered and intelligent.' ") (citations omitted).
With these cases in mind, the Court finds that the IJ who ordered Reyes Nunez's removal in 2006 violated Reyes Nunez's fundamental rights by failing to determine whether his waiver of a removal hearing was knowing, voluntary, and intelligent, as required by § 1003.25(b). Even though § 1003.25(b) does not appear to require an IJ to hold a formal hearing to determine whether a waiver was valid, see United States v. Gonzales-Campos , No. 2:13-CR-255 (JLG), 2014 WL 1091043, at *6 (S.D. Ohio Mar. 18, 2014) ("Nowhere does § 1003.25(b) state that the immigration judge is required to hold a hearing in the case of an unrepresented alien, or is required to address an unrepresented alien personally before making that determination."), IJs are required to make an express finding, by reviewing and developing evidence in the record, that the waiver of an uncounseled defendant was valid, see United States v. Valverde-Rumbo , No. 14-CR-620 (RMW), 2015 WL 6507090, at *2-3 (N.D. Cal. Oct. 28, 2015) (holding that § 1003.25(b) does "not require that the alien personally appear before the Immigration Judge, but it at least requires additional evidence beyond a signed stipulation purportedly waiving rights"). Since the IJ made no such finding in this case, the Court finds that the IJ's procedural error implicated Reyes Nunez's fundamental rights.
B. Prejudice
In addition to the defect in the underlying removal proceedings, Reyes Nunez must show that he was prejudiced by that defect in order to collaterally attack his prior unlawful entry conviction. Copeland , 376 F.3d at 73. To show prejudice, *244 a defendant must establish that, "absent the procedural errors, he would not have been removed." Fernandez-Antonia , 278 F.3d at 159. The Second Circuit has explained that the appropriate test for prejudice is similar to the test for ineffective assistance of counsel, i.e. prejudice is shown where "there is a reasonable probability that, but for counsel's [IJ's] ... errors, the result of the proceeding would have been different." Copeland , 376 F.3d at 73 (quoting Strickland v. Washington , 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ). A defendant can demonstrate prejudice only by showing that he had plausible grounds for relief from deportation. Edwards v. INS , 393 F.3d 299, 311 (2d Cir. 2004) (noting that a court must "play the role of prognosticator, and divine whether, had the error not occurred, the defendant would likely have obtained immigration relief"). Accordingly, "[r]esolution of the prejudice issue ... is somewhat akin to a trial within a trial." Copeland , 376 F.3d at 73.
Reyes Nunez contends that he was prejudiced because the IJ did not inform him of his eligibility for voluntary departure or political asylum, and there was a reasonable probability he would have succeeded in his application had he been advised of his right to apply for one or both of these avenues of relief. (Def's. Mot., at 25.) The government contends that Reyes Nunez cannot show a reasonable likelihood of success because he explicitly waived his rights to voluntary departure by signing the Stipulated Removal and the second Request for Disposition of Salvadorans and did not inform the authorities about his fear of MS-13 at the time of his removal in 2006.
An IJ is required to inform eligible aliens about the availability of discretionary relief, including voluntary departure; failure to do so is a basis for a remand by the BIA. See United States v. Garcia , No. 08-CR-32 (ARR), 2008 WL 3890167, at *10 (E.D.N.Y. Aug. 19, 2008) (citing In re Julio Antonio Cordova , 22 I. & N. Dec. 966, 970-72, 1999 WL 590719 (BIA 1999) ). "The requirement that the IJ inform an alien of his or her ability to apply for relief from removal is mandatory, and failure to so inform the alien of his or her eligibility for relief from removal is a denial of due process that invalidates the underlying deportation proceeding." United States v. Ubaldo-Figueroa , 364 F.3d 1042, 1050 (9th Cir. 2004) (internal quotation marks omitted). Specifically, under 8 C.F.R. § 1240.11(a)(2), "[t]he Immigration Judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing." An alien may be eligible for fast-track voluntary departure as long as he is not barred from relief due to terrorism-related activities or an aggravated felony. See 8 U.S.C. § 1229c(a)(1) ; 8 U.S.C. § 1227(a).[4]
Here, Reyes Nunez alleges that, when he was deported in 2006, he did not have a conviction that would have prevented him from being eligible for fast-track voluntary departure. Reyes Nunez argues that the IJ's error deprived him of "the right to apply for voluntary departure in lieu of deportation, either at the outset of his *245 removal proceeding (to the exclusion of any other applications for relief) or at the end of the evidentiary hearing on his asylum" because the IJ did not advise him of this right. (Def's. Mot., at 25.) The government does not claim that Reyes Nunez was statutorily barred from voluntary departure, but rather argues that he expressly waived these rights when he signed the removal forms. Yet Reyes Nunez's signatures do not reliably indicate what he would have done had the IJ advised him of his right to apply for voluntary departure. See United States v. Gonzalez , No. 15-CR-0021 (JMF), 2015 WL 3443942, at *11 (S.D.N.Y. May 29, 2015) (finding prejudice where Plaintiff was not afforded the opportunity to seek voluntary departure and noting "any rational person who understood that the choice was between voluntary departure and deportation following additional detention would have chosen to seek the former."). It is reasonable to infer that had Reyes Nunez been advised of such eligibility, he would have taken advantage of the opportunity to voluntarily depart and not to be involuntarily removed.[5] See United States v. Crisostomo-Rios , No. CR-10-2060 (FVS), 2010 WL 3433906, at *2 (E.D. Wash. Aug. 31, 2010) (holding that IJ failed to determine whether defendant's waiver was knowing, intelligent, and voluntary, and thereby prejudiced defendant by not informing him of the option of voluntary departure). The IJ failed to ensure that Reyes Nunez was apprised of his right to seek voluntary departure under 8 U.S.C. § 1229c(a) ; 8 C.F.R. § 1240.11(a)(2). Given that failure, and the reasonable probability that he would have obtained such relief, Reyes Nunez has established prejudice.[6]
CONCLUSION
For the foregoing reasons, Reyes Nunez has established both a due process violation and resulting prejudice. The Court finds that Reyes Nunez's 2006 deportation was unconstitutional. Based on the foregoing, the Court finds that Reyes Nunez's indictment must be dismissed.
SO ORDERED.

The Supreme Court has ruled that when Congress enacts a procedure, aliens are entitled to it. United States ex rel. Knauff v. Shaughnessy , 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.").

See infra regarding the availability of discretionary relief from deportation under Section 212(c).

The Fifth Circuit cited the following cases: United States v. Soto-Mateo , 799 F.3d 117 (1st Cir. 2015) ; United States v. Santiago-Ochoa , 447 F.3d 1015 (7th Cir. 2006) ; United States v. Torres , 383 F.3d 92 (3rd Cir. 2004) ; United States v. Aguirre-Tello , 353 F.3d 1199 (10th Cir. 2004) (en banc); Smith v. Ashcroft , 295 F.3d 425 (4th Cir. 2002) ; Oguejiofor v. Attorney General of U.S. , 277 F.3d 1305 (11th Cir. 2002) ; Escudero-Corona v. INS , 244 F.3d 608 (8th Cir. 2001) ; and Ashki v. INS , 233 F.3d 913 (6th Cir. 2000).

In September 1996, Congress passed two amendments to the INA that fundamentally altered the availability of discretionary relief to certain classes of aliens for whom deportation orders had been issued: (1) the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") and (2) the Antiterrorism and Effective Death Penalty Act. The IIRIRA repealed § 212(c) of the INA, 8 U.S.C. § 1182(c), in its entirety, "thereby eliminating discretionary relief from deportation that was previously available to noncitizens convicted of aggravated felonies." United States v. Gill , 748 F.3d 491, 498 (2d Cir. 2014).

The Court notes that Reyes Nunez did not include in his affidavit any mention of a previous intention to voluntarily depart (or seek political asylum) (see Dkt. 17-1), but argues in his motion that he was deprived of the option of voluntary departure (see Def's. Mot., at 16, 25, 35).

Because the Court finds prejudice based on the IJ's failure to advise Reyes Nunez of his right to voluntarily depart, the Court does not address Reyes Nunez's argument that he could have sought political asylum based on his opposition to MS-13.